1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAVID J. CARPENTER,

Petitioner,

v.

KEVIN CHAPPELL, Warden of
California State Prison at San Quentin,

Respondent.

NO. C 00-3706  MMC

ORDER DENYING GROUP III
CLAIMS 4, 15C, 16, 18, 19, 20,
21, 26 and 27

**DEATH PENALTY CASE**

**Introduction**

The instant case arises from petitioner's conviction and death sentence for murdering five

people in Marin County and raping or attempting to rape three of them.  His crimes occurred

between October 11, 1980, and November 28, 1980.  Due to pre-trial publicity, the case was tried in

San Diego County.  On November 29, 1999, the California Supreme Court affirmed petitioner's

conviction and death sentence.  *See People v. Carpenter*, 21 Cal. 4th 1016 (1999).[1]  On October 2,

2000, the United States Supreme Court denied a petition for certiorari.  *See Carpenter v. California*,

531 U.S. 838 (2000).  Prior to affirmance of his conviction and sentence on direct review, petitioner

---

[1] Petitioner was separately convicted and sentenced to death for, among other things,
murdering two people and attempting to murder a third in Santa Cruz County between March and
May 1981.  The Santa Cruz County charges, also due to pre-trial publicity, were tried in Los
Angeles County.  Petitioner's conviction and death sentence based on that case is the subject of a
separate federal habeas petition pending before this Court.  *See Carpenter v. Woodford*, C 98-2444
MMC, ("*Carpenter I*").

**United States District Court**

For the Northern District of California

filed two separate state habeas petitions.  The first was filed in the trial court on September 28, 1988, and was based on allegations of juror misconduct.  The trial court granted the petition and ordered a new trial, but the California Supreme Court subsequently reversed the new trial order and denied the petition.  *See In re Carpenter*, 9 Cal.4th 634 (1995).  The second was filed in the California Supreme Court on November 1, 1999, and was denied on January 13, 2000.  *See In re Carpenter*, No. S083246.

On November 4, 2002, petitioner filed a petition for a writ of habeas corpus in federal district court.  On November 26, 2002, this Court granted petitioner's motion to hold the proceedings in abeyance while he filed a second state habeas petition in the California Supreme Court.  On December 18, 2002, the California Supreme Court denied the second state petition, and on December 27, 2002, petitioner filed his First Amended Petition for Writ of Habeas Corpus ("First Amended Petition") in federal district court.

Respondent subsequently filed a motion to dismiss the First Amended Petition, in which respondent primarily asserted various procedural grounds that, respondent argued, required dismissal of at least certain portions of the First Amended Petition.  Thereafter, in a series of orders, this Court addressed all of those procedural issues.

In 2008, based on allegations in the First Amended Petition and the applicable law, the Court issued an order for a timely determination of petitioner's competency, pursuant to *Rohan ex, rel. Gates v. Woodford*, 334 F. 3d 803 (9th Cir. 2003).  *See id.* at 817 (holding petitioners have "statutory right to competence in [their] habeas proceedings").  Based on the case record and the examination report of stipulated expert Dr. Robert Roesch, this Court found petitioner competent to pursue his habeas claims.[2]

The parties thereafter met and conferred, and agreed to a briefing schedule, subsequently amended by this Court, by which the remainder of petitioner's claims were to be addressed.  The schedule also separated the claims into nine separate groups.  This Order addresses Claims 4, 15C,

---

[2] Petitioner appealed certain of the Court's orders regarding the competency determination; on July 31, 2009, the Ninth Circuit Court of Appeals dismissed and denied the appeal in an unpublished memorandum.  *See Carpenter v. Ayers*, Nos. 08-99019 & 08-99020, 2009 WL 2387288. (9th Cir. 2009).

1  16, 18 19, 20, 21, 26 and 27 in Group III.   For the following reasons, all of said claims will be

2  denied.

3  **Legal Standard**

4  Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), this Court

5  may not grant a writ of habeas corpus with respect to any claim that was adjudicated on the merits in

6  state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was

7  contrary to, or involved an unreasonable application of, clearly established Federal law, as

8  determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

9  on an unreasonable determination of the facts in light of the evidence presented in the State court

10  proceeding."  28 U.S.C § 2254(d).[3]  A federal court must presume the correctness of the state court's

11  factual findings, and the presumption of correctness may only be rebutted by clear and convincing

12  evidence.  28 U.S.C. § 2254(e)(1).

13  The "contrary to" and "unreasonable application" clauses of section 2254(d) have separate

14  and distinct meanings.  *See Williams v. Taylor*, 529 U.S. 362, 404 (2000).  A state court's decision is

15  "contrary to" clearly established United States Supreme Court law if it fails to apply the correct

16  controlling authority or if it applies the controlling authority to a case involving facts materially

17  indistinguishable from those in a controlling case, but nonetheless reaches a different result.  *Id*. at

18  413-414.  A decision is an "unreasonable application" of United States Supreme Court law if  "the

19  state court identifies the correct governing legal principle . . .  but unreasonably applies that principle

20  to the facts of the prisoner's case."  *Id*. at 414.  A federal court must bear in mind, however, that "'an

21  *unreasonable* application of federal law is different from an *incorrect* application of federal law.'"

22  *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (citing *Williams*, 529 U.S. at 410) (emphasis in

23  original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so

24  long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Id*. at

25  786 (citing *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004)).

26

27

28  [3] The parties agree that AEDPA applies to this matter.

United States District Court

For the Northern District of California

1   In that regard, "a federal habeas court may not issue the writ simply because the court

2   concludes in its independent judgment that the relevant state-court decision applied clearly

3   established federal law erroneously or incorrectly[;] [r]ather, that application must be objectively

4   unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).  "While the 'objectively

5   unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of

6   deference to the state courts" than previously had been accorded them.  *Clark v. Murphy*, 331 F.3d

7   1062, 1068 (9th Cir. 2003).

8       The holdings of the Supreme Court at the time of the state court decision are the only

9   definitive source of clearly established federal law under AEDPA.  *See Williams*, 529 U.S. at 412.

10  While circuit law may be "persuasive authority" for purposes of determining whether a state court

11  decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings

12  are binding on the state courts and only those holdings need be reasonably applied.  *See Clark*, 331

13  F.3d at 1070.  A state court's decision need not cite to and a state court need not be aware of federal

14  law to pass muster under AEDPA; rather, "so long as neither the reasoning nor the result of the

15  state-court decision contradicts [federal law]," the decision may be upheld.  *Early v. Packer*, 537

16  U.S. 3, 8 (2002).

17      When a federal court is presented with a state court decision that is unaccompanied by a

18  rationale for its conclusions, the court has no basis other than the record "for knowing whether the

19  state court correctly identified the governing legal principle or was extending the principle into a

20  new context."  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  In such situations, federal courts

21  must conduct an independent review of the record to determine whether the state court decision is

22  objectively unreasonable.  *Id.*   Specifically, "where a state court's decision is unaccompanied by an

23  explanation, the habeas petitioner's burden still must be met by showing there was no reasonable

24  basis for the state court to deny relief."  *Richter*, 131 S. Ct. at 784.

25      Moreover, even if a petitioner meets the requirements of section 2254(d), habeas relief is

26  warranted only if the constitutional error at issue had a substantial and injurious effect or influence

27  in determining the jury's verdict.  *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).  Under this

28  standard, petitioners "may obtain plenary review of their constitutional claims, but they are not

1    entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual

2    prejudice.'"  *Brecht*, 507 U.S. at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

**Analysis**

3

**I.      Claim 4: Multiple Prosecutions**

4

5         In Claim 4, petitioner contends the state's decision to prosecute him in two cases, brought in

6    two different counties and using evidence from each such case in the other, violated his right to due

7    process.  On direct appeal, the California Supreme Court denied this claim in a reasoned opinion, as

8    follows:

9                    1.      *Alleged Impermissible Multiple Prosecutions*

10               In *Carpenter II*, defendant argued that the two Santa Cruz murders should
         have been tried separately (*Carpenter II, supra,* 15 Cal. 4th at ¶. 361-362.)  Now he
11        argues that all of the Marin County and Santa Cruz County crimes should have been
         tried together.  He claims that trying him separately for the crimes committed in each
12        county violated Penal Code section 654 and "his rights to due process, and to a
         reliable penalty determination."  Just as we disagreed that the Santa Cruz County
13        crimes had to be tried piecemeal, so, too, do we disagree that the all the crimes in
         both counties had to be tried together.
14

15               As pertinent, Penal Code section 654 provides that when an "act or omission .
         . . is punishable in different ways by different provisions of law," an "acquittal or
16        conviction and sentence under any one bars a prosecution for the same act or
         omission under any other." [Footnote omitted].  Defendant argues that this provision
17        bars prosecution of the Marin County crimes after he was convicted of the Santa Cruz
         County crimes.  He relies principally on *Kellett v. Superior Court* (1966) 63 Cal. 2d
18        822 [parallel citation omitted].  In *Kellett*, the defendant was standing on a public
         sidewalk with a pistol in his hand.  He was charged with and pleaded guilty to a
19        misdemeanor charge of exhibiting a firearm in a threatening manner.  We held that
         this conviction prohibited a later prosecution for the felony of possessing a
20        concealable weapon by a felon arising out of the same facts.  *Kellett* bears no
         similarity to this case.  Whatever the scope of that decision, the murder or separate
21        victims on separate days in separate counties is not a single act or even a "course of
         conduct" (*id. at p. 827*) requiring a single prosecution. . . .

22               Penal Code section 790 generally places venue for a murder charge in the
         county (1) where the fatal injury was inflicted, (2) where the victim died, or (3) where
23        the body was found.  Santa Cruz was the site for all three of the murders charged in
         that county, Marin County the site for all three of the murders charged in that county.
24        Defendant waived his right to be tried in those counties when he successfully moved
         to change venue.  But no authority permitted, and none compels, murders committed
25        in different counties to be tried together. . . .

26               Because evidence of some of the crimes of the other county was presented in
         each trial, defendant contends the successive prosecution violated due process.  It did
27        not.  (*Ciucci v. Illinois* (1958) 356 U.S. 571 [parallel citations omitted].) . . . We also

28

United States District Court

For the Northern District of California

disagree that trying both sets of crimes separately resulted in an unreliable penalty determination.[4]

*Carpenter*, 21 Cal. 4th at 1038-1039.

Petitioner has not cited to any clearly established federal law demonstrating the state court's denial of this claim was objectively unreasonable, nor has he shown such denial relied on an unreasonable determination of the facts.  Significantly, petitioner can point to no clearly established federal law holding, or even suggesting, that multiple prosecutions for multiple murders violates due process.

As the California Supreme Court correctly stated, controlling Supreme Court authority regarding this issue is *Ciucci v. Illinois*, 356 U.S. 571 (1958).  Defendant *Ciucci* killed his wife and three children and left them in a burning building; he was subsequently prosecuted for the deaths of his wife and two of the children in three separate trials.  In each trial, the prosecution introduced evidence from all four of the deaths.  Each trial resulted in a different sentence: 20 years in prison, 45 years in prison, and death.  Ciucci argued on appeal that the multiple trials violated his due process rights.  *Ciucci*, 356 U.S. at 572.

The Supreme Court rejected Ciucci's argument, holding "[t]he State was constitutionally entitled to prosecute these individual offenses singly at separate trials, and to utilize therein all relevant evidence."  *Id.* at 573.  The same is true here, and petitioner has not shown such prosecution in two trials for multiple crimes was, in any manner, fundamentally unfair.  *Id.*

Petitioner argues the Supreme Court, by a footnote in *United States v. Ewell*, 383 U.S. 116, 125 n.9 (1996), limited *Ciucci* to its facts.  Petitioner is incorrect.  In *Ewell*, the Court rejected a claim of double jeopardy, and in so doing noted that the issue therein was to be distinguished from that in *Ciucci*, which "involved only the question whether the Fourteenth Amendment prevents a state from bringing successive prosecutions against a defendant where each prosecution alleges the same statutory offense and the same general transaction but names different victims."  *Id.* at 125 n.9.

---

[4] Defendant does not specifically argue the separate prosecutions violated the prohibition against double jeopardy.  That argument would also lack merit.  "'[T]he murder of two persons, even by the same act, constitutes two offenses, for each of which a separate prosecution will lie, and . . . , a conviction or acquittal in one case does not bar a prosecution in the other.'" (*People v. McLain*, *supra*, 46 Cal. 3d at pp.120-121, quoting *People v. Majors* (1884) 65 Cal. 138, 146-147.)

United States District Court

For the Northern District of California

The *Ewell* Court did not otherwise mention nor rely on *Ciucci*, and there is nothing in the footnote limiting *Ciucci* to its particular facts or suggesting that it is not to be used as precedent.  Indeed, as respondent correctly points out*, Ciucci* did not even address double jeopardy, which was at issue in *Ewell*.  Accordingly, petitioner's reliance on *Ewell* is misplaced.

In sum, as petitioner can cite to no federal precedent compelling the result he seeks, he cannot demonstrate the state court's decision denying his claim was unreasonable, and, consequently, his claim will be denied.

## II.    Claim 15C: Cross-Examination of Tina Vance

In Claim 15C, petitioner asserts it was constitutional error for the trial court to limit his cross-examination of Tina Vance.  This claim was denied by the California Supreme Court in a reasoned opinion on direct appeal.  Under 28 U.S.C. § 2254(e)(1), the factual findings made by the California Supreme Court, set forth below, are presumptively correct.

1.    *Evidentiary Rulings as to One Witness*

A witness [Tina Vance] testified on direct examination that one weekend in September or October 1980, when she was 14 years old, she went to Mollie Purnell's home in Modesto with her boyfriend.  Defendant showed her and the boyfriend a "big handgun" and talked about "burglaries and thieving and things like that."  She understood defendant "to be a professional thief, that's what he said, and a burglar and things like that."  The next day she went with defendant to San Francisco.  On the way, they stopped at a park.  Defendant showed her what he called his "thief kit," a suitcase containing another gun, woven wire like the kind used to hang pictures, and strips of nylon or cloth.  Referring to the nylon or cloth, defendant said, "This is what I use to gag people with."  Referring to the wire, he said, "This is what I use to tie them up with."  The witness testified that the gun she saw at the park was smaller than the one she saw earlier that weekend.  The second gun looked like the gun used in the killings.  The first time she told anyone about seeing two different guns was two days before her testimony at this 1988 trial.

. . . .

[D]efendant argues the court improperly limited his cross-examination of the witness in two respects.  First, defendant sought to cross-examine her about her probationary status in a juvenile matter at the time she first spoke with law enforcement about the case.  The court ruled that defense counsel could not ask her whether she was on probation but could ask her whether she had a juvenile case, and could "develop with her whether she thought in any aspect of that juvenile case she was going to get any benefit in this case or anybody made any promise to her about the facts underlying her juvenile adjudication, in which she allegedly used a gun.  The court ruled that the defense could ask the witness about her familiarity with guns, but it did not allow the defense to go into the details of the juvenile case.  On cross-examination, the witness denied knowing much about guns.  The defense again sought to go into the details of the facts underlying the juvenile matter.  The court

7

ruled her testimony did not "open up the door." It found the underlying facts were not "probative with respect to . . . what has been offered by the prosecution," and that "it just would be cumulative and totally a waste of time for [the defense] to probe into . . . the underlying circumstances of her juvenile case." We find no error.

"[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby, to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680 [parallel citations, internal quotation, and citation omitted]. However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance. (*Van Arsdall*, *supra*, 475 U.S. at ¶. 678-679 . . . .) California law is in accord. (*See People v. Belmontes* (1988) 45 Cal. 3d 744, 780 [parallel citations omitted].) Thus, unless a defendant can show that the prohibited cross-examination would have produced 'a significantly different impression of [the witnesses'] credibility' (*Van Arsdall, supra* 475 U.S. at p. 680), the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment." (*People v. Frye* (1998) 18 Cal. 4th 894, 946 [parallel citations omitted].)

As he did at trial, defendant relies heavily on *Davis v. Alaska* (1974) 415 U.S. 308 [parallel citations omitted]. In *Davis*, a "crucial witness for the prosecution" was on juvenile probation both at the time of the events about which he testified and at trial. (*Id.* at 310-311.) Because of state rules requiring confidentiality of juvenile adjudications, the trial court refused to allow any cross-examination about the witness's juvenile history. The court found the blanket prohibition violated the defendant's right to confront witnesses. However, that decision does not require courts to permit any cross-examination the defense may wish regarding juvenile proceedings. (*See Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678-679 [parallel citations omitted].) Here, the trial court considered the state of the evidence and *Davis v. Alaska*, *supra*, 415 U.S. 308. It permitted the defense to inquire into whether the witness had a juvenile case and whether she received any promises or expected any benefits regarding that matter. It did not preclude the defense from presenting evidence she *did* receive any promises or benefits; the defense did not claim it had any such evidence. Moreover, the defense did not claim, and the record does not indicate, that the witness was on probation when she testified several years later. The record does not establish the prohibited cross-examination would have produced "a significantly different impression of [the witness's] credibility . . . ." (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at p. 680 [parallel citation omitted].) Accordingly, we find no abuse of discretion.

We also find the court did not abuse its discretion in not permitting the defense to probe into the facts underlying the juvenile adjudication. Defendant argues that because the facts allegedly involved the witness's use of a gun, the evidence showed she was familiar with guns, contrary to her trial testimony. Her familiarity with guns was of marginal relevance. Defendant argues this familiarity shows she could have fabricated her testimony about seeing the two guns. Her testimony, however, was not particularly technical; she would not have needed great knowledge about guns to invent it. Courts may "prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues." (*People v. Wheeler* (1992) 4 Cal. 4th 284, 296.) . . .

Moreover, rather than being "crucial" (*Davis v. Alaska, supra*, 415 U.S. at p. 310), this witness was minor in the context of the entire case. Even assuming the court permitted the prosecution to elicit too much information, and the defense too little, we would find the error harmless under any standard.

*Carpenter*, 21 Cal. 4th at 1046-1052.

Petitioner contends his rights under the Confrontation Clause were violated by the trial court's limitations on his cross-examination of Tina Vance. The Confrontation Clause provides that, in criminal cases, the accused has the right to "be confronted with the witnesses against him." U.S. Const. Amend. VI. This right includes the opportunity to cross-examine witnesses. *Davis v. Alaska*, 415 U.S. 308, 315-316 (1974) (noting "a primary interest" secured by Confrontation Clause is right of cross-examination) (internal quotation and citation omitted).

Limits on cross-examination, however, are permitted. The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam). Accordingly, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examinations based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). A limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony, prejudices the defendant, and denies the jury sufficient information to appraise the biases and motivations of the witnesses. *United States v. Urena*, 659 F. 3d 903, 907-908 (9th Cir. 2011); *Fenenbock v. Director of Corrections*, 692 F.3d 910, 919 (9th Cir. 2012) (finding trial court violates Confrontation Clause only when it prevents defendant from examining "a particular and relevant topic").

Petitioner has not cited to any clearly established federal law demonstrating the state court's denial of this claim was objectively unreasonable, nor has he shown the state court's denial of the claim relied on an unreasonable determination of the facts. The state court's reasoned opinion demonstrates, and this Court's review of the record confirms, that the trial court's limitation on cross-examination of Vance was reasonable. In contrast to the situation in *Davis*, where the trial

9

court issued a blanket prohibition against any cross-examination regarding the witness' juvenile record, the trial court in petitioner's case *did* allow petitioner's attorney to inquire into whether the witness had a juvenile case and whether she received any promises or expected any benefits regarding that matter.  Further, the trial court did not preclude the defense from presenting evidence that Vance did receive promises or benefits.  *See Carpenter*, 21 Cal. 4th at 1051.  Additionally, the witness in *Davis* was a key witness, *see* 415 U.S. at 310, while Vance was a "minor [witness] in the context of the entire case," *Carpenter*, 21 Cal. 4th at 1051.  As the California Supreme Court reasonably found, additional cross-examination would not have produced "'a significantly different impression of [the witness's] credibility. . . .,'" *Carpenter*, 21 Cal. 4th at 1051 (citing *Van Arsdall*, 475 U.S. at 680), and petitioner thus cannot demonstrate the trial court's decision to limit cross-examination constituted error.

Morever, Confrontation Clause claims are subject to harmless error analysis.  *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004).  For purposes of federal habeas corpus review, the standard applicable to violations of the Confrontation Clause is whether the inadmissible evidence had an actual and prejudicial effect upon the jury.  *See Hernandez v. Small*, 282 F.3d 1132, 1144 (9th Cir. 2002) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).  Here, even if petitioner had shown that the trial court's rulings were in error, he has not demonstrated he suffered any prejudice.  Petitioner was allowed to impeach Vance, whose testimony was not crucial, let alone dispositive; multiple additional witnesses connected petitioner to the murder weapon and identified him as the shooter.

Accordingly, this claim will be denied.

## III.   Claim 16: Admission of Certain Statements by Petitioner

In Claim 16, petitioner contends the trial court admitted several items of allegedly irrelevant and prejudicial evidence, and thereby violated his due process rights.  The California Supreme Court denied this claim in a reasoned opinion on direct appeal, as follows:

2.   *Other Evidentiary Rulings*

Defendant contends the court made several other erroneous evidentiary rulings. One witness testified that in February 1981, defendant said he carried a gun in his van. The witness never saw the gun.  Another witness testified that in February

or March 1981, defendant showed her a gun that "looks like" the murder weapon. The court ruled both items of evidence admissible over objection. We find no error. Although the witnesses did not establish the gun necessarily was the murder weapon, it might have been. Unlike *People v. Riser, supra,* 47 Cal. 2d at page 577, this evidence did not merely show that defendant was a person who possesses guns, but showed he possessed a gun that might have been the murder weapon after the first and before the last of the killings. The evidence was thus relevant and admissible as circumstantial evidence that he committed the charged offenses. (*People v. Neely, supra* 6 Cal. 4th at p. 896.)

Another witness testified over objection that around late April or early May 1981, defendant told her "there is really nothing like the power of a gun to achieve the ends you want"; "it was really the ultimate challenge to get away with murder"; and rape "is really an ultimate achievement, to do something like that." The court excluded any statements about "robberies." Defendant contends the evidence was inadmissible character evidence under Evidence Code section 1101 and should have been excluded as unduly prejudicial under Evidence Code section 352. The Attorney General argues, first, that the claims are not cognizable on appeal because defendant failed to object on these grounds at trial. We disagree. Although he did not specifically cite Evidence Code section 1101 in objecting to these statements (he did in making similar objections to other items of evidence), he did object on the ground that the statements merely showed he was a "criminal" and a "bad person." Under the circumstances, the specific nature of the objection was sufficiently clear to preserve the issue.

The contention, however, lacks merit. Evidence that defendant talked about using guns and committing murder and rape soon after the rapes and murders in this case, all involving the use of a gun, was circumstantial evidence that he committed the charged crimes. Unlike *People v. Guerrero, supra,* 16 Cal. 3d 719, which defendant cites, where the prosecution presented evidence the defendant committed an uncharged crime, the prosecution here did not suggest these statements showed defendant committed crimes other than those of this case; rather, these statements were admitted to show he committed *these* crimes. Defendant argues the statements were merely "part of a philosophical discussion about crime." If so, they were of little relevance. But, from the evidence as a whole, the jury could reasonably find they were a very general relevance to the charged crimes, which made them relevant to whether he committed them.

Defendant also contends the record fails to show the court considered the prejudicial effect of the evidence. However, a court need not expressly state for the record it engages in a weighing process every time it makes a ruling. (*People v. Crittenden* (1994) 9 Cal. 4th 83, 135 [parallel citations omitted].) The record as a whole shows the court was well aware of, and consistently performed, its duty under Evidence Code section 352 to balance the probative value of evidence against any prejudicial effect.

A defense witness testified on direct examination that he was defendant's employer at a trade school in Hayward. They "became friends." The witness also operated another business called "Moon Tide" at the same location. He testified that time sheets indicated defendant was at work until 2:15 p.m. the day another defense witness said she saw a man who might have been the gunman near the scene of the Hansen/Haertle shooting. On cross-examination, the witness said defendant was also involved in the Moon Tide business. Over objection, the witness testified defendant invested about $2000 into the business. The prosecution was allowed to introduce into evidence a letter dated November 16, 1980, that defendant wrote to the witness

11

1  demanding repayment of this money by November 30, 1980.  The letter threatened
2  after that date to "turn[] on the vigorish clock," i.e., to charge the amount of interest
   "used in the loan sharking business," which would make the witness owe about
3  $10,000 by December 1.  The amount owed would "increase rapidly" after that.  The
   letter said, "either pay me now or pay me a lot more later," and concluded, "Your old
4  pal, now your ex-old pal."

5         Defendant contends the letter was irrelevant and inadmissible "character"
   evidence.  The court admitted the letter as relevant to the witness's "credibility with
6  respect to bias and prejudice" and also relevant in light of defense cross-examination
   of Millie Purnell.  Previously, the defense had elicited from Purnell that defendant told
7  her he wanted the gun to "move money" for the "Mafia."  We see no error in light of
   the defense evidence.  As the court found, evidence that the witness and defendant
8  were not merely friends and employer-employee was relevant to the witness's
   credibility and to the reliability of the employment records used to establish the partial
9  alibi.  "Evidence showing a witness's bias or prejudice or which goes to his
   credibility, veracity or motive may be elicited during cross-examination."  (*People v.
10 Howard* (1988) 44 Cal. 3d 375, 428 [parallel citations omitted].)  Moreover, the
   evidence was relevant to corroborate the testimony the defense elicited from Purnell in
11 an apparent attempt to discredit her testimony.  Defendant argues the letter should
   have been excluded as too prejudicial.  We disagree.  The letter was relatively
12 innocuous.  As the court noted, the reference to the "loan sharking business" was not
   much different from the "Mafia" reference the defense itself elicited from Purnell.
13 The court acted within its discretion in admitting the letter.

*Carpenter*, 21 Cal. 4th at 1052-1054.

14        Petitioner has not cited to any clearly established federal law demonstrating the state court's

15 denial of this claim was objectively unreasonable, nor has he shown the state court's denial of the

16 claim relied on an unreasonable determination of the facts.  A petitioner's burden in demonstrating a

17 due process violation based on a trial court's evidentiary decisions is substantial.  *Estelle v. McGuire*,

18 502 U.S. 62, 68 (1991);  *Boyde v. Brown*, 404 F. 3d 1159, 1172 (9th Cir. 2005).  The admission of

19 evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated

20 or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed

21 by due process.  *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784

22 F.2d 984, 990 (9th Cir.).  The Supreme Court "has not yet made a clear ruling that admission of

23 irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant

24 issuance of the writ."  *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding trial

25 court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth

26 Circuit precedent but not contrary to, or an unreasonable application of, clearly established Federal

27 law under section 2254(d)).  The due process inquiry in federal habeas review is whether the

28

United States District Court

For the Northern District of California

1    admission of evidence was so prejudicial that it rendered the trial fundamentally unfair. *Walters v.*

2    *Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. Only if there are no permissible

3    inferences that the jury may draw from the evidence can its admission violate due process. *See*

4    *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991).

5            In petitioner's case, as the state court reasonably found, there were permissible inferences the

6    jury could have drawn from the testimony at issue. *See Jammal*, 926 F. 2d at 920. It would have

7    been permissible for the jury to infer that the statements about guns, murder and rapes were a

8    "general reference to the charged crimes, which made them relevant to whether [petitioner]

9    committed them." *Carpenter*, 21 Cal. 4th at 1053. The letter was admitted as relevant to witness

10   credibility, and as to the reliability of evidence elicited by petitioner's counsel. *Id.* To the extent

11   petitioner contends the state evidentiary rules at issue in his trial give rise to a protected liberty

12   interest under *Hicks v. Oklahoma*, 447 U.S. 343 (1980), his argument also fails. To begin with, the

13   Supreme Court has confirmed that not every state-law error rises to the level of a federal due process

14   violation. *Rivera v. Illinois*, 556 U.S. 148, 159 (2009). Moreover, as the California Supreme Court

15   held in its reasoned opinion, there was no state-law error in the admission of the evidence at issue.

16   *Carpenter*, 21 Cal. 4th at 1052-1054. A state court's interpretation of state law, including one

17   announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

18   corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629 (1988).

19           Furthermore, petitioner has not shown any of the above-referenced alleged errors were

20   prejudicial. Even if a petitioner meets the requirements of section 2254(d), habeas relief is warranted

21   only if the constitutional error at issue had a substantial and injurious effect or influence in

22   determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993). Under this

23   standard, as noted, petitioners "may obtain plenary review of their constitutional claims, but they are

24   not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual

25   prejudice.'" *Brecht*, 507 U.S. at 637, citing *United States v. Lane*, 474 U.S. 438, 439 (1986). Here,

26   petitioner maintains that the testimony at issue was irrelevant and prejudicial character evidence that

27   could have made the jury more likely to conclude he committed the charged crimes. As the state

28   court reasonably found and as the record confirms, however, there was substantial other evidence

1   introduced against petitioner to show he committed the charged offenses, *see Carpenter*, 21 Cal. 4th at

2   1029-1032, and, given the strength of the evidence against him, there is no reasonable likelihood that

3   without the challenged evidence, petitioner would have been acquitted.  Petitioner thus cannot

4   establish he suffered any prejudice, and, consequently, his claim fails for that reason as well.  *See*

5   *Brecht*, 507 U.S. at 637.

6         Accordingly, this claim will be denied.

7   **IV.    Claim 18: Admission of Autopsy Photos**

8         In Claim 18, petitioner contends admission of autopsy photos deprived him of his rights to

9   due process and a fundamentally fair trial.   The California Supreme Court denied this claim in a

10  reasoned opinion on direct appeal, as follows:

11              3.      *Photographs*

12        The prosecution sought to admit a number of photographs of the murder
    victims.  The court excluded some as unduly prejudicial but admitted others over

13  defense objection, including three of victims O'Connell and May.  The court admitted
    one to show the mark on O'Connell's neck, which was relevant to whether the wire

14  one witness said defendant showed her could have inflicted it.  The court admitted two
    to support the pathologist's testimony regarding the manner of death and sequence of

15  shots.  Defendant contends the court erred in admitting the photographs and violated
    his federal constitutional rights.  "Because defendant objects only on statutory

16  grounds, the constitutional arguments are not cognizable on appeal."  *Carpenter II*,
    *supra*, 15 Cal. 4th at p. 385.)  Moreover, "The court did not abuse its broad discretion

17  in admitting the photographs."  (*Ibid.*)  They were relevant for the purposes identified.
    The court carefully exercised its discretion in excluding photographs it found unduly

18  gruesome and admitting others it found less gruesome.

19  *Carpenter*, 21 Cal.4th at 1054.

20         Petitioner cannot demonstrate he is entitled to relief on this claim.  As this Court has already

21  noted, petitioner bears a substantial burden in demonstrating a due process violation based on the

22  trial court's evidentiary rulings.  *See Estelle*, 502 U.S. at 68.  The admission of evidence is not

23  subject to federal habeas review unless a specific constitutional guarantee is violated or the error is

24  of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process,

25  *see Henry*, 197 F.3d at 1031, and, as noted, the Supreme Court "has not yet made a clear ruling that

26  admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient

27  to warrant issuance of the writ," *Holley*, 568 F.3d at 1101. The due process inquiry on federal habeas

28  review is whether the admission of evidence was so prejudicial that it rendered the trial

United States District Court

For the Northern District of California

1   fundamentally unfair.  *Walters*, 45 F.3d at 1357; *Colley*, 784 F.2d at 990.  Only if there are no

2   permissible inferences that the jury may draw from the evidence can its admission violate due

3   process.  *See Jammal*, 926 F.2d at 920.

4      In order to show a violation of due process based on photographic evidence, petitioner "must

5   demonstrate that the erroneous admission of the photographs rendered his trial fundamentally

6   unfair."  *Villafuerte v. Steward*, 111 F. 3d 616, 627 (9th Cir. 1997) (finding photographs of blood at

7   crime scene and of bindings used on murder victim relevant evidence to show defendant knowingly

8   restrained victim with intent to kill or injure her, and, as such, did not deprive defendant of fair trial);

9   *see also Kealohapauole v. Shimoda,* 800 F. 2d 1463, 1465-1466 (9th Cir. 1986) (holding 45-minute

10  video of murder victim's autopsy was relevant to show cause of death and did not render defendant's

11  trial fundamentally unfair).

12     Here, as the state court found and as the court's review of the record confirms, the

13  photographs in question were relevant to show how the victims were killed, and thus to connect the

14  murder weapon to petitioner, and they also corroborated the testimony of pathologist Dr. Ervin

15  Jindrich on a significant issue.  Consequently, there were permissible inferences the jurors could

16  draw from the photographs, and petitioner thus cannot demonstrate their introduction in evidence

17  rendered his trial unfair.   *See Jammal*, 926 F.2d at 920.  This claim will be denied.

18  **V.  Claim 19: Fourth Amendment Claim**

19     In Claim 19, petitioner argues that evidence obtained through wrongful searches and seizures

20  was improperly used against him at his trial.  This claim was rejected by the California Supreme

21  Court in a reasoned decision on direct appeal, as follows:

22          3.  *Search and Seizure Issues*

23     At trial, defendant moved to suppress various items of evidence.  He contends
 the court erred in denying the motion.  As a threshold matter, the Attorney General

24   argues that because defendant made a similar motion to suppress evidence in the first
 prosecution (*see Carpenter II, supra*, 15 Cal. 4th at ¶. 362-366), he is collaterally

25   estopped from relitigating the searches' legality. [citations omitted].  The Attorney
 General makes a similar argument as to other issues that are common to both

26   prosecutions.  We need not decide whether and to what extent collateral estoppel
 applies here, because none of the contentions have merit. . . .

27

28     As in the earlier appeal, defendant challenges a search warrant for the search
 of his home, person, and cars.  He makes one argument not made in the first appeal.

He argues that the warrant was overbroad because it did not "particularly describ[e] the . . . things to be seized." (Cal. Const.' art. I, § 13.) He does not clearly specify what evidence admitted at trial was seized under a provision that he claims was overbroad, but he appears to challenge the admission of maps and "Sierra Club materials . . . including books, hiking schedules, and maps of Mt. Tamalpais." The warrant authorized the seizure of "National or State Park material brochures, maps, receipts, or literature; and road maps." The authorization was appropriate. The police had probable cause to believe defendant was a serial killer of victims along isolated hiking trails. Under the circumstances, the range of potential relevant evidence was quite broad. "[I]n a complex case resting upon the piecing together of many bits of evidence the warrant properly may be more generalized than would be the case in a more simplified case resting upon more direct evidence." (*People v. Bradford* (1997) 15 Cal. 4th 1229, 1291 [parallel citations, additional internal quotation, and citation omitted].) Items showing familiarity with the crime scenes were clearly relevant to connect defendant to these crimes.

The remaining portions of the warrant that defendant challenges as overbroad also seem reasonably directed to the seizure of relevant evidence. But we need not decide the question definitively. Defendant has not identified any item seized under any of these provisions which was admitted at trial. Accordingly, even if we assume some provision of the warrant was overbroad, defendant has not shown that any evidence should have been suppressed. (*People v. Camarella* (1991) 54 Cal. 3d 592, 607, fn. 7 [parallel citations omitted].)

Defendant also argues the affidavits supporting the warrant contained material misstatements and omitted material facts, and the search of his home exceeded the warrant's scope. On the latter point, defendant challenges only one item of evidence actually admitted at trial, a pair of athletic shoes. Our discussion rejecting similar arguments in *Carpenter II, supra*, 15 Cal. 4th at pages 362-364, also applies to these contentions.

Defendant challenges the seizure and subsequent search of his Chevrolet station wagon. We rejected most of the arguments in *Carpenter II, supra*, 15 Cal. 4th at pages 364-365. Defendant makes new arguments that some of the information supporting probable cause was stale, and that the affidavits supporting the warrant omitted more material information than he argued before. Having considered the new arguments, we continue to find there was probable cause to search the vehicle and that the supporting affidavits were not substantially misleading. Defendant also challenges the seizure of the bullet from the car. We previously rejected a similar argument. (*Carpenter II, supra,* 15 Cal. 4th at p. 365.) To the extent defendant's current contention differs from his previous one, we find nothing warranting a different outcome.

Finally, defendant argues the police unlawfully obtained his federal prison and parole records. His federal probation officer allowed the police to review the records when they were investigating these crimes. Later the police obtained copies of some of the records from federal authorities. Defendant argues these events violated the federal Freedom of Information and Privacy Acts. (5 U.S.C. §§ 552, 552a.) Assuming that the acts cover these records (see *United States v. Miller* (10th Cir. 1981) 643 F. 2d 713, 715), the Privacy Act allows disclosure "for a routine use . . ." (5 U.S.C. § 552a(b)(3).) The probation officer testified that he provided the information to the police under agency rules stating that approved routine uses include "'providing assistance to federal, state, local or foreign enforcement officers investigating a violation of law.'" Defendant does not challenge the accuracy of this testimony. "Consequently, no violation of the Privacy Act occurred." (*United States*

16

*v. Miller, supra*, 643 F. 2d at p. 715 [additional citations omitted].  Because defendant
has shown no violation of the acts, we need not decide whether a violation would
require the suppression of evidence.

*Carpenter*, 21 Cal.4th at 1043-1044.

Petitioner cannot prevail on this claim.  To begin with, as petitioner does and must

acknowledge,  *Stone v. Powell*, 428 U.S. 465, 481-82, 494 (1976), bars federal habeas review of

Fourth Amendment claims unless the state did not provide an opportunity for full and fair litigation

of those claims.  Even if the state courts' determination of the Fourth Amendment issues is improper,

it will not be remedied in federal habeas corpus actions so long as the petitioner was provided a full

and fair opportunity to litigate the issue.  *See Locks v. Sumner*, 703 F.2d 403, 408 (9th Cir. 1983).

All *Stone v. Powell* requires is the initial opportunity for a fair hearing.  Such an opportunity for a

fair hearing forecloses, upon habeas review, this Court's inquiry into the trial court's subsequent

course of action, including whether or not the trial court made any express findings of fact.  *See

Caldwell v. Cupp*, 781 F.2d 714, 715 (9th Cir. 1986).  The existence of a state procedure allowing an

opportunity for full and fair litigation of Fourth Amendment claims, rather than a defendant's actual

use of those procedures, bars federal habeas consideration of those claims.  *See Gordon v. Duran*,

895 F.2d 610, 613-14 (9th Cir. 1990) (holding whether or not defendant litigated Fourth Amendment

claim in state court is irrelevant if he had opportunity to do so under California law).  California

state procedure provides an opportunity for full and fair litigation of any Fourth Amendment claim.

*See Terrovona v. Kincheloe*, 912 F.2d 1176, 1178-79 (9th Cir. 1990), *cert. denied*, 499 U.S. 979

(1991) (discussing factors relevant to opportunity for full and fair litigation of claim).

Petitioner suggests the bar set forth in *Stone* should not apply in capital habeas cases and that

AEDPA calls such bar into question.  Petitioner, however, cites to no clearly established federal law

that in any way limits *Stone* to non-capital and/or pre-AEDPA cases.  Indeed, as respondent

correctly points out, case authority is to the contrary.  (*See* Respondent's Brief at 39-40 and cases

cited therein.)  Further, even if *Stone* did not preclude this Court from examining the merits of his

claim,  petitioner would not be entitled to relief.  The state court's reasoned opinion was not

objectively unreasonable under any clearly established federal law, nor was it based on an

unreasonable determination of the facts.

1    Accordingly, this claim will be denied.

2  **VI.    Claim 20: Admission of Evidence Allegedly Obtained in Violation of *Miranda***

3         In Claim 20, petitioner asserts the state courts unreasonably relied on the inevitable

4  discovery doctrine to admit evidence obtained as an alleged result of a violation of petitioner's

5  *Miranda* rights.  The California Supreme Court denied this claim in a reasoned opinion on direct

6  appeal, as follows:

7              3.    *Evidence Allegedly Obtained in Violation of Defendant's Miranda*
                    *Rights*

8

9              Defendant moved to suppress evidence he claimed was obtained in violation
        of his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [parallel citations
        omitted].  On May 13, 1981, defendant's parents told the police that Dr. Stamper was
10      the family optometrist.  Sergeant Brook went to the doctor's office the same day and
        was told that defendant's mother was a patient but not defendant.  Sergeant Brook
11      testified at the suppression hearing that he was dissatisfied with the information he
        had received from the office and had decided to return to investigate further.  He
12      questioned defendant after his arrest on May 15, 1981, and asked further questions
        after defendant invoked his right to counsel.  Defendant told him that he had ordered
13      some glasses from Dr. Stamper.  The next day, another officer went to the doctor's
        office and interviewed various employees, including Jacqueline Purcell.[5]

14

15             The prosecution did not present evidence of defendant's statement, but Purcell
        testified at the guilt phase that on May 2, 1981, defendant came to the doctor's office
16      to have his glasses repaired and to order a new pair of glasses with the model name
        "Hillside."  She sometimes saw him wearing a baseball cap.  The court refused to
17      suppress the evidence, finding that the police inevitably would have discovered
        Purcell as a potential witness.  In a detailed oral ruling, the court specifically
18      "accept[ed] and credit[ed]" Sergeant Brook's testimony.  It found that Sergeant
        Brook was still very interested in Dr. Stamper's office, and had he "not received the
19      direct information from [defendant] on May 15th, that he . . . or some other
        investigator would have gone back to Dr. Stamper's office. . . ."  In addition to
20      Sergeant Brook's testimony, the court noted the sheer size and scope of the
        investigation into the serial killer case in determining that the police would inevitably
21      have discovered Purcell's information.

22             The parties agree that Sergeant Brook obtained defendant's statement in
        violation of the *Miranda* rules.  Accordingly, the statement itself was inadmissible; it
23      was not admitted.  Defendant argues that the court also had to suppress Purcell's
        testimony as the fruit of the poisonous tree.  (*See generally Wong Sun v. United*
24      *States* (1963) 371 U.S. 471 [parallel citations omitted]).  The Attorney General
        responds that the fruit of the poisonous tree does not apply to a noncoerced statement
25      taken in violation of the *Miranda* rules. . . . We need not resolve the question because
        we uphold the trial court's application of the inevitable discovery rule.

26             Evidence need not be suppressed if the prosecution can establish by a

27

28  _____
         [5] Eyeglasses were relevant to the investigation because victim Haertle described the glasses
    worn by his assailant, and the police were aware that petitioner wore glasses.  37 RT 2212-2219.  In
    addition, prescription eyeglasses were found at the scene of another murder that was believed to
    share a similar modus operandi with the Marin County murders.  37 RT 2295-2298.

United States District Court

For the Northern District of California

preponderance of the evidence that the information would inevitably have been discovered by lawful means.  (*Nix v. Williams* (1984) 467 U.S. 431 [parallel and additional citations omitted].  As this is essentially a question of fact, we must uphold the trial court's determination if supported by substantial evidence.  (*See People v. Boyer, supra*, 48 Cal. 3d at p. 263 . . .)  Deferential review is particularly necessary when, as here, the factual determination depends in part on judging a witness's credibility.  Here, substantial evidence supports the court's finding.  Sergeant Brook, whose testimony the court specifically credited, testified he had intended to return to the office to investigate further.   Urging his own view of the evidence, defendant argues the police might not have discovered the information absent the *Miranda* violation, but we have no basis on which to overturn the court's determination.

Defendant also argues that the inevitable discovery rule should not apply because of the "flagrancy" of the unlawful conduct.  We implicitly disagreed in *People v. Boyer, supra*, 48 Cal. 3d at pages 277-279.  Although Sergeant Brook clearly violated the prophylactic *Miranda* rules, the record does not suggest that defendant's statement was coerced or otherwise involuntary.  In those circumstances, federal law (and California law today) allows even the statement itself to be used for impeachment. . . . When, as here, the evidence would have been discovered lawfully even absent the *Miranda* violation, "the deterrence rational [of the exclusionary rule] has so little basis that the evidence should be received.  Anything less would reject logic, experience, and common sense."  *Nix v. Williams*, *supra*, 467 U.S. at p. 444 [parallel citation omitted].

Moreover, any error would have been harmless, whether measured by the reasonable doubt standard applicable to federal constitutional error (*Chapman v. California*  (1967) 386 U.S. 18, 24 [parallel citations omitted]) or the reasonable probability standard applicable to errors of state law.  (*People v. Watson* (1956) 46 Cal. 2d 818, 836-837 [parallel citation omitted]).  The issue of guilt was not even remotely close.  The trial court correctly described the evidence of defendant's guilt as "overwhelming."  (*Carpenter I, supra,* 9 Cal. 4th at p. 645.)  The evidence of identity was so strong that defendant did not contest it at the first trial.  Defendant's friend, Mollie Purnell, purchased the gun used to commit all the crimes.  Purnell and other witnesses connected him to that weapon.  It is unreasonable to suppose that Purnell, Shane Williams, who told the police where to find the murder weapon, and Karen Williams, Shane's wife and partner in crime, all chose to commit perjury to help convict an innocent person of capital crimes.  In addition, "[r]egarding the Hansen/Haertle crimes, there were multiple eyewitness identifications, evidence regarding the distinct jacket both the gunman and the defendant wore, shoeprint evidence, and evidence that defendant owned a car similar to the gunman's." *Carpenter II, supra,* 15 Cal. 4th at p. 362.).

At the second trial, defendant did attempt to establish a doubt as to his identity as the gunman but did little to diminish the force of the prosecution evidence.  Defendant presented virtually no alibi evidence other than his own testimony.  An employer testified that he was at work with her until as late as 5:30 to 6:00 p.m. the day Alderson was killed.  Even if one believes the witness could remember that particular day with such precision, the testimony proved little.  The victim was seen alive around 5:30 p.m. that day, and her body was not discovered until two days later.  Defendant presented documentary evidence that he claimed supported his testimony regarding some of his activities the day Moreland and Stowers were killed, but even crediting those documents, they did not prevent him from being the killer on that date.  Moreover, an expert testified that someone intentionally altered the date on two of the documents.

United States District Court

For the Northern District of California

Defendant also presented the testimony of some witnesses who saw a person who might have been the gunman but presumably was not defendant. The evidence may have shown a few false leads, or that some witnesses noticed the gunman's jacket but did not particularly note his face at a time when there was no reason to. It did little else. Moreover, two of these witnesses testified that defendant *did* look like the person they saw. Defendant presented evidence showing that a particular shoe similar (not identical) to one he purchased could not have made the gunman's footprints, but other evidence established that the shoes he purchased could have made the footprints; they were of the same size and pattern.

Defendant testified, denying the crimes and describing in great detail his activities during the relevant times, but his testimony was far from convincing. He admitted wearing the distinctive jacket and purchasing the shoes similar in size and pattern to those of the gunman. He also admitted knowing Purnell and others who connected him to the murder weapon. Testifying after he reviewed telephone records, he admitted he had numerous telephone conversations with Purnell during the relevant times, including four the day before she purchased the eventual murder weapon, one the day after she purchased it, and others around the time she received it. He denied that these conversations related to her purchasing the gun for him and claimed that she was lying. He also denied his other acquaintances' testimony that connected him to the murder weapon. He admitted owning a red Fiat like the gunman's, which he said he purchased on March 25, 1981. He also admitted that when he talked to the police a few days before his arrest, in response to their questions about his vehicles, he told them about one of his cars but not the Fiat. He claimed he understood the police to be interested only in the cars to which he had access on May 2, 1981, and he did not have access to the Fiat on that date because it was "in the shop." Defendant testified he was at work all day the day Alderson was killed. On direct examination, he referred to some records that he said showed he had typed a response to a certain business letter from Hong Kong that day. On cross-examination, the prosecution confronted him with his employer's records showing that the letter from Hong Kong was itself dated the day Alderson was killed. Defendant then acknowledged that he could not have written the response when he said he did.

In light of the trial as a whole, Purcell's testimony was insignificant. Any error in allowing her to testify was harmless.

*Carpenter*, 21 Cal.4th at 1039-1042.

Petitioner has not pointed to any clearly established federal law demonstrating the state court's denial of this claim was objectively unreasonable, nor has he shown the state court's denial of the claim relied on an unreasonable determination of the facts. It is undisputed that petitioner's statement regarding Dr. Stamper was made after petitioner had invoked his right to counsel and thus was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and that, consequently, petitioner's statement was not admitted at trial. Although petitioner argues that the evidence obtained as a result of his statement ought to have been suppressed under the "fruit of the poisonous tree" doctrine, *see Wong Sun v. United States*, 371 U.S. 471 (1963), the "fruit of the poisonous tree"

**United States District Court**
For the Northern District of California

1  doctrine does not operate in the *Miranda* context in the same way that it does in the Fourth

2  Amendment context.  In the former, as the Supreme Court has held, "the exclusionary rule

3  articulated in cases such as *Wong Sun* does not apply."  *See United States v. Patane*, 542 U.S. 630,

4  636 (2004) (plurality opinion) (finding physical fruits of voluntary statements taken in violation of

5  *Miranda* not excludable).

6       Here, petitioner has never contended his statement regarding Dr. Stamper was involuntary,

7  and there is no evidence in the record that he was in any manner subjected to coercion.  Indeed, the

8  trial court hearing regarding this issue confirmed there was no coercion, and that petitioner himself

9  stated he was "treated fairly" by the interrogating officer.  38 RT 2361-2362.  *See Colorado v.*

10  *Connelly*, 479 U.S. 157, 167 (1986) (holding confession is involuntary under Fourteenth

11  Amendment only if product of "coercive police activity"); *see also Pollard v. Galaza*, 290 F.3d

12  1030, 1034 (9th Cir. 2002).

13       Moreover, as the state court reasonably found, *see Carpenter*, 21 Cal.4th at 1040-1041, the

14  discovery of Dr. Stamper's office, as well as the eventual testimony of his employee Purcell, was

15  inevitable.  *See Nix v. Williams*, 467 U.S. 431, 444 (1983) (holding evidence obtained as result of

16  illegal conduct by police admissible where such evidence would have been discovered even absent

17  illegal conduct).  Finally, petitioner has not shown that any alleged evidentiary errors were

18  prejudicial to him.  Even if a petitioner meets the requirements of section 2254(d), habeas relief is

19  warranted only if the constitutional error at issue had a substantial and injurious effect or influence

20  in determining the jury's verdict.  *Brecht* , 507 U.S. at 638.  As the state court reasonably found and

21  as the record confirms, there was a considerable amount of other evidence introduced against

22  petitioner to demonstrate he committed the crimes, *Carpenter*, 21 Cal. 4th at 1041-1042, and there is

23  no reasonable likelihood that without Purcell's testimony, petitioner would have been acquitted.

24  Given the strength of the evidence against him, petitioner cannot establish that any alleged

25  evidentiary error was prejudicial to him.  *Brecht*, 507 U.S. at 637.

26       Accordingly, this claim will be denied.

27  **VII.**  **Claim 21: Admission of Eyewitness Identification Evidence Obtained Via Lineup**

28       In Claim 21, petitioner contends identification evidence used against him was obtained by an

unfair lineup in violation of his rights to counsel and due process.  The California Supreme Court

denied this claim in a reasoned opinion on direct appeal, as follows:

> *4.*     *Denial of Motion to Suppress Identification Evidence*

After defendant's arrest, several witnesses viewed him in a six-man physical lineup.  Defendant contends the lineup was impermissibly suggestive.  We rejected a similar argument regarding the same lineup in *Carpenter II, supra*, 15 Cal. 4th at pages 366-368.  As we held in that case, nothing in the lineup caused defendant to "'stand out' from the others in a way that would suggest the witness should select him." (*Id.* at p. 367.)  "[A]s a whole, the lineup was not unduly suggestive.'" (*Ibid.*)

Although two defense attorneys attended the lineup, defendant also contends his right to their assistance was violated because they were not allowed to be present at interviews with the witnesses just before and after the lineup.  He relies solely on *People v. Williams* (1971) 3 Cal. 3d 853 [parallel citations omitted].  In *Williams*, defense counsel was present for the lineup, but after viewing it, the witness "was taken outside the viewing room for the purpose of making his identification. Appellant's attorney asked permission to accompany [the witness] and listen to any identification made by him" but was not permitted to do so.  (*Id.* at p. 855.)  Under these facts, we found a violation of the defendant's rights to an attorney.  Defendant argues a similar violation occurred in this case.  We rejected a similar argument in *Carpenter II, supra*, 15 Cal. 4th at pages 368-369, and distinguished *Williams* partly on the basis that here the actual identifications occurred in the presence of defense counsel.  Defendant now makes new factual arguments that two of the witnesses, one who identified him at the lineup and one who selected someone else, made the actual identifications in defense counsel's absence.

In response, the Attorney General argues first that, because the lineup was held before formal judicial proceedings had begun, defendant was not entitled to counsel at all.  (*Kirby v. Illinois* (1972) 406 U.S. 682 [parallel citations omitted]; *United States v. Gouveia* (1984) 467 U.S. 180, 187-188 [parallel citations omitted].) He notes that the holding of *People v. Bustamente* (1981) 30 Cal. 3d 88 [parallel citations omitted], which established a contrary rule under state law, applied prospectively only (*id.* at p. 102), and that the lineup of this case occurred months before that decision.  It appears that at the time of the lineup, formal charges had been filed for the Santa Cruz County crimes but not the crimes charged in this case.  We need not decide whether defendant's right to counsel applied only to the Santa Cruz County crimes because there was no violation of the right as to any of the crimes.

The evidence was conflicting whether the two witnesses made their identifications during the lineup or afterwards.  The witnesses themselves testified they received and marked identification cards after the lineup.  However, the detective who escorted the witnesses individually to and from the lineup testified that the witnesses who identified defendant did so in the lineup room.  The victim, Haertle, testified he marked his identification form in the lineup room, suggesting that the detective's pattern was to have the witnesses fill out the card in the lineup room.  The trial court could reasonably have credited the detective's testimony, concluding that the two witnesses, who testified long after the lineup, merely forgot they had received the lineup card during the lineup.  The court did not expressly resolve this factual question, but "[a]n order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown." (*Corenevsky v. Superior Court* (1984) 36 Cal. 3d 307, 321 [parallel citations omitted].)  We must "view the record in the light most favorable to the trial court's

1   ruling and defer to its findings of historical fact, whether express or implied, if they
    are supported by substantial evidence." (*People v. Miranda* (1993) 17 Cal. App. 4th
2   917, 922 [parallel citations omitted].)  Because substantial evidence supports an
    implied finding that the witnesses made their identifications in the lineup room,
3   defendant has not demonstrated error.

4        Moreover, we see no basis to exclude any evidence even if either or both of
    the two witnesses had actually marked the lineup card in counsel's absence.  The
5   *Williams* court expressly limited its holding to its facts and "expressed[ed] no opinion
    on any case which may arise in a different factual setting." (*People v. Williams*,
6   *supra*, 3 Cal. 3d at p. 857.)  In this case, the interviews were tape-recorded, which
    "minimized the concerns that led to the adoption of the *Williams* rule." (*Carpenter II*,
7   *supra*, 15 Cal. 4th at p. 369).  Unlike *Williams*, counsel here could listen to the
    recording of the interview, and thus be "fully apprised" of what occurred. (*People v.*
8   *Williams*, *supra* 3 Cal. 3d at p. 856.)  *Williams* was narrowly decided.  As Justice
    Mosk's strong dissent, joined by two others, noted, defense counsel must not be
9   allowed to interfere with a police investigation. (*Id.* at p. 860.)

10  *Carpenter*, 21 Cal.4th at 1045-1046.

11       Petitioner has not cited to any clearly established federal law demonstrating the state court's

12  denial of this claim was objectively unreasonable, nor has he shown the state court's denial of the

13  claim relied on an unreasonable determination of the facts.  Petitioner first argues the identifications

14  were made under unduly suggestive circumstances.  As the state court reasonably found, however,

15  and as the record confirms, the identification process was not unduly suggestive.  *See id.* at 1045

16  (incorporating detailed findings made in *Carpenter II, 15 Cal.4th* at 366-68, as to participants in

17  lineup*).*  The cases relied upon by petitioner concern the admissibility of identification evidence

18  once it has already been determined that the procedures were unduly suggestive.  *See*, *e.g.*, *Manson*

19  *v. Brathwaite*, 422 U.S. 98 (1977); *Neil v. Biggers*, 409 U.S. 188, 199 (1972).  Here, by contrast,

20  petitioner can point to no evidence demonstrating the state court decision holding the identification

21  process was not unduly suggestive was based on an unreasonable determination of the facts.  *See* 28

22  U.S.C. § 2254(d).  Consequently, to the extent petitioner's claim is based on an assertedly

23  suggestive lineup, the claim fails.

24       Secondly, petitioner argues that, although defense counsel for the Santa Cruz County charges

25  was present, no attorney had been appointed for the Marin County homicides and he thus was

26  improperly denied the assistance of counsel as to the Marin County charges.  At the time of the

27  lineup, however, petitioner had not been charged with any crimes in Marin County.  As petitioner

28  acknowledges in his brief, controlling United States Supreme Court authority confirms there is no

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

1  right to counsel at pre-indictment lineups, as the right to counsel does not attach until adversary

2  judicial proceedings have been initiated against a defendant. *See Kirby v. Illinois,* 406 U.S. 682,

3  688-691 (1972).  Consequently, to the extent petitioner's claim is based on an asserted denial of

4  counsel, the claim likewise is unavailing.

5      Accordingly, this claim will be denied.

6  **VIII.    Claim 26: Jury Instructions Regarding Theories of First Degree Murder**

7      In Claim 26, petitioner argues the trial court erroneously instructed the jury that, if it

8  unanimously agreed petitioner was guilty of first-degree murder, it did not have to unanimously

9  agree on the underlying theory of murder.   According to petitioner, such instruction violated his

10 rights under the Sixth, Eighth and Fourteenth Amendments.  The California Supreme Court rejected

11 this claim in a reasoned opinion on direct appeal, as follows:

12          As to the murders of Alderson, O'Connell, and May, the court instructed the
    jury on felony murder as a theory of first degree murder.  It also instructed that if the

13      jury unanimously agreed defendant was guilty of first degree murder, it was not
        required to agree on a theory.  Defendant argues the instruction was erroneous.  We

14      have repeatedly rejected the argument. (*Carpenter II, supra,* 15 Cal. 4th at ¶. 394-
        395, and cases cited.)  Any error was also harmless.  As to the murders of Moreland

15      and Stowers, the court instructed only on premeditation as a theory of first degree
        murder.  The jury convicted defendant of the first degree murder of those victims,

16      thus finding premeditation.  It is hard to imagine how the jury could find defendant
        premeditated those killings and not the others.  Moreover, as to the other three

17      victims, the jury also found defendant guilty of rape or attempted rape and found true
        the rape-murder special circumstance.  The jury thus unanimously agreed with a first-

18      degree felony-murder theory. (*Carpenter II, supra,* 15 Cal. 4th at p. 395.)

19 *Carpenter*, 21 Cal. 4th at 1058.

20      Petitioner cannot point to any clearly established federal law demonstrating the state court's

21 denial of this claim was objectively unreasonable, nor has he shown the state court's denial of the

22 claim relied on an unreasonable determination of the facts.  Indeed, petitioner concedes that his

23 ability to prevail on this claim is foreclosed by *Sullivan v. Borg*, 1 F. 3d 926, 927-929 (9th Cir.

24 1993).  In *Sullivan*, the Ninth Circuit found no due process violation where an instruction permitted

25 jurors to convict on a first degree murder charge without requiring unanimity with respect to a

26 finding of felony murder or premeditation and deliberation, because California permissibly

27 characterized first-degree murder as "'a single crime as to which a verdict need not be limited to any

28 one statutory alternative.'" *See id.* (quoting *Schad v. Arizona*, 501 U.S. 624, 630-631 (1991)).

1    Accordingly, this claim will be denied.

2    **IX.      Claim 27: Jury Instructions Regarding Circumstantial Evidence**

3        In Claim 27, petitioner contends various guilt phase instructions regarding circumstantial

4    evidence unconstitutionally reduced the prosecution's burden of proof.  According to petitioner,

5    such instructions violated his rights to due process and to a reliable guilt phase verdict.  In particular,

6    petitioner challenges the use of the words "appear" and "duty" in CALJIC No. 2.01, which, in part,

7    states: "If . . .  one interpretation of such [circumstantial] evidence appears to you to be reasonable

8    and the other interpretation to be unreasonable, it would be your duty to accept the reasonable

9    interpretation and to reject the unreasonable."  *See* CALJIC No. 2.01.  He also challenges similar

10    language that appears in CALJIC Nos. 2.02 (circumstantial evidence of specific intent), 8.83

11    (circumstantial evidence of special circumstances), and 8.83.1 (circumstantial evidence of mental

12    state for special circumstances), all of which were given at the guilt phase.  On habeas review, the

13    California Supreme Court, in a summary opinion, denied the claim, both on procedural grounds and

14    on the merits.

15        The Due Process Clause of the Fourteenth Amendment protects the accused against

16    conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

17    crime with which he or she is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  This constitutional

18    principle prohibits the state from using evidentiary presumptions in a jury charge that have the effect

19    of relieving the state of its burden of persuasion beyond a reasonable doubt of every essential

20    element of a crime.  *See Yates v. Evatt*, 500 U.S. 391, 400-03 (1991); *Carella v. California*, 491 U.S.

21    263, 265-66 (1989); *Francis v. Franklin*, 471 U.S. 307, 313 (1985); *Sandstrom v. Montana*, 442 U.S.

22    510, 520-24 (1979).  So long as the trial court instructs the jury on the necessity that defendant's

23    guilt be proven beyond a reasonable doubt, the Constitution does not require that any particular form

24    of words be used in advising the jury of the government's burden of proof.   *Victor v. Nebraska*, 511

25    U.S. 1, 6 (1994).  Rather, taken as a whole, the instructions must correctly convey the concept of

26    reasonable doubt to the jury.  *See id.* (citing *Holland v. United States*, 348 U.S. 121, 140 (1954)).

27    The proper inquiry is "whether there is a reasonable likelihood that the jury understood the

28    instructions to allow conviction based on proof insufficient to meet the *Winship* standard."  *Id*. at 6.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Petitioner is unable to demonstrate that the state court's decision is objectively unreasonable.

2    *See Delgado*, 223 F.3d at 982.  Petitioner does not argue that the instructions given at his trial

3    regarding reasonable doubt were inadequate, nor has he shown that the challenged instructions in

4    any manner compelled the jurors to disregard the reasonable doubt standard.  Petitioner has cited to

5    no case that calls into question the constitutionality of the cited jury instructions, which permissibly

6    instruct the jurors to accept reasonable interpretations of the evidence.  Indeed, the California

7    Supreme Court has consistently held CALJIC No. 2.01 and the above-challenged related instructions

8    do not reduce the state's burden of proof, *see, e.g.*, *People v. Brasure*, 42 Cal. 4th 1037, 1058

9    (2008); *People v. Snow*, 30 Cal. 4th 43, 95 n.18 (2003); and while neither the United States Supreme

10   Court nor the Ninth Circuit appear to have squarely addressed CALJIC No. 2.01 or the related

11   instructions, at least one district court has held CALJIC No. 2.01 does not reduce the state's burden

12   of proof and is not in violation of clearly established federal law, *see Lara v. Allison*, 2011 WL

13   835594, *13-14 (C.D. Cal. 2011).[6]

14   As those cases make clear, petitioner takes the challenged language out of context.  In both

15   CALJIC Nos. 2.01 and 8.83 themselves, the jury was first expressly instructed that every fact

16   necessary to prove an element of the offense or special circumstance must be proved beyond a

17   reasonable doubt.  Further, those instructions, as well as CALJIC Nos. 2.02 and 8.83.1, expressly

18   admonished the jury that if two reasonable inferences could be drawn from the circumstantial

19   evidence, it was the jury's duty to reject the inference pointing to the defendant's guilt or special

20   circumstance.

21   Accordingly, as there is no "reasonable likelihood that the jury understood the instructions to

22   allow conviction based on proof insufficient to meet the *Winship* standard," *see Victor*, 511 U.S. at 6,

23   this claim will be denied.

24   //

25   //

26   //

27   _____

28   [6] The language of said instructions as given at petitioner's trial and at the time of the trials under consideration in the above-referenced cases is in all material respects the same.

26

**United States District Court**
For the Northern District of California

**Conclusion**

For the foregoing reasons, Claims 4, 15C, 16, 18, 19, 20, 21, 26 and 27 in petitioner's First Amended Petition are hereby DENIED.

**IT IS SO ORDERED.**

DATED: August 26, 2013

_____
MAXINE M. CHESNEY
UNITED STATES DISTRICT JUDGE

27