UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DAVID J. CARPENTER,

　　　　　Petitioner,

　　v.

RON DAVIS, Warden of California State
Prison at San Quentin,

　　　　　Respondent.

Case No. 00-cv-03706-MMC

**ORDER DENYING REMAINING
GROUP 4 CLAIMS**

**<u>DEATH PENALTY CASE</u>**

**INTRODUCTION**

　　　The instant case arises from Petitioner's conviction and death sentence on five counts of first-degree murder, two counts of rape, and one count of attempted rape. These crimes were committed in Marin County on three separate dates between October 11, 1980, and November 28, 1980. Due to pre-trial publicity, the case was tried in San Diego County. On November 29, 1999, the California Supreme Court affirmed Petitioner's conviction and death sentence. *See People v. Carpenter*, 21 Cal. 4th 1016 (1999).[1] On October 2, 2000, the United States Supreme Court denied a petition for certiorari. *See Carpenter v. California*, 531 U.S. 838 (2000). Prior to affirmance of his conviction and sentence on direct review, Petitioner filed two separate state habeas petitions. The first was filed in the trial court on September 28, 1988, based on allegations of juror misconduct. The trial court granted the petition and ordered a new trial, but the California Supreme Court reversed the trial court's order and denied the petition. *See In re Carpenter*, 9 Cal.4th 634 (1995). The second was filed in the California Supreme Court on November 1, 1999, and was denied on

---

[1] Petitioner was separately convicted and sentenced to death for, among other things, murdering two people and attempting to murder a third in Santa Cruz County between March and May of 1981. *See People v. Carpenter*, 15 Cal.4th 312 (1997). The Santa Cruz County charges, also due to pre-trial publicity, were tried in Los Angeles County. Petitioner's conviction and death sentence based on the Santa Cruz County case is the subject of a separate federal habeas petition before this Court, *Carpenter v. Chappell*, No. 98-cv-2444-MMC, ("*Carpenter I*"). In media reports and subsequent court opinions, Petitioner was given the moniker "Trailside Killer."

January 13, 2000. *See In re Carpenter*, No. S083246.

Petitioner filed a federal Petition for Writ of Habeas Corpus (Dkt. No. 36) in this district on November 4, 2002. On November 26, 2002, the Court granted Petitioner's motion to hold the proceedings in abeyance while he filed a third state habeas petition in the California Supreme Court. On December 18, 2002, the California Supreme Court denied the third state petition, *see In re Carpenter*, No. S110890, and on December 27, 2002, Petitioner filed the instant First Amended Petition for Writ of Habeas Corpus ("FAP"). (Dkt. No. 41.)

Respondent subsequently filed a "Motion for Adjudication of Procedural Bars" (Dkt. No. 73) asserting various procedural grounds for dismissal of numerous claims presented in the FAP. The Court addressed the procedural issues in a series of orders. *See* Order Re Procedural Default (Dkt. No. 78);[2] Order Re Procedural Default (Dkt. No. 175); Order Granting Pet'r's Mot. For Reconsideration (Dkt. No. 184); and Amend. Order Granting Resp.'s Mot. For Reconsideration (Dkt. No. 200). In short, and as will be further discussed in relevant part in this Order, the Court has found numerous claims presented in the FAP are procedurally barred.

In 2008, based on allegations in the FAP and the applicable law, the Court issued an order requiring Petitioner's competency be determined in a timely manner, pursuant to *Rohan ex, rel. Gates v. Woodford*, 334 F. 3d 803 (9th Cir. 2003). *See id*. at 817 (holding petitioners have "statutory right to competence in [their] habeas proceedings"). Based on the case record and the examination report of stipulated expert Dr. Robert Roesch, the Court found Petitioner competent to pursue his habeas claims.[3]

The parties subsequently met and conferred and agreed to a briefing schedule to address the remainder of Petitioner's claims, dividing the remaining claims into nine separate claim groups.

---

[2] On February 15, 2008, the case was reassigned to the undersigned. (Dkt. No. 97.)

[3] Petitioner appealed to the Ninth Circuit Court of Appeals certain of the Court's orders regarding the competency determination; the appeal was dismissed and denied in an unpublished memorandum on July 31, 2009. *See Carpenter v. Ayers*, 341 F. App'x 320 (9th Cir. 2009).

This Order addresses Group 4, specifically, Claims 10.C.2, 10.C.4, 10.C.5, and 11.[4]   For the following reasons, these claims will be **DENIED**.

## FACTUAL BACKGROUND[5]

### I.   Guilt Phase

On October 11, 1980, Cynthia Moreland ("Moreland") and Richard Stowers ("Stowers") were killed near a hiking trail in Point Reyes National Seashore.  Hikers reported hearing gunshots in the area between 1:00 p.m. and 2:00 p.m.  Moreland's and Stowers's bodies were discovered on November 29, 1980.  They had been fatally shot in the head.

On October 13, 1980, Anne Alderson ("Alderson") was killed near a hiking trail on Mount Tamalpais.  She was reportedly last seen at approximately 5:30 p.m. that evening and was found two days later, fatally shot in the head at close range.  Alderson's vagina contained sperm, indicating penetration "around the time she died."  *See Carpenter*, 21 Cal.4th at 1029.  The semen was of a type consistent with approximately fifteen to nineteen percent of the Caucasian population, including Petitioner.

On November 28, 1980, Diane O'Connell ("O'Connell") and Shauna May ("May") were killed at Point Reyes National Seashore.  Hikers heard shots in the area around 3:10 p.m., with more shots following approximately ten minutes later.  O'Connell's and May's nude bodies were discovered the next day, each fatally shot in the head.  O'Connell had a pair of panties in her "mouth and nose area" and, in addition to the gunshot wound, physical evidence indicated she had been strangled with a narrow piece of cord or wire.  *Id.* at 1030 (internal quotation omitted).   May's vagina and rectum contained sperm, indicating, as with Alderson, penetration around the time of

---

[4] The other Group 4 claims, specifically, Claims 10.C.1, 10.C.3, 13, 14, 17, 22, 23, and 25, have been found procedurally barred, *see* Order re Procedural Default (Dkt. No. 175), and were not briefed by the parties in their Group 4 briefing. Although, in the same Order, Claim 11 likewise has been found procedurally barred, the Court, for reasons explained below, nevertheless has addressed that claim herein, pursuant to the standard of review set forth in 28 U.S.C. § 2254(d).

[5] The Court relies heavily on the California Supreme Court's recitation of the facts in *People v. Carpenter*, 21 Cal. 4th at 1029-34.

3

death, and, in addition, a "vague ligature mark" was found on her left wrist. *Id.* The area where the bodies of O'Connell and May were discovered was approximately 200 yards from the area where the bodies of Moreland and Stowers were discovered.

In addition to the murders of Moreland, Stowers, Alderson, O'Connell, and May, the prosecution presented evidence of Petitioner's March 29, 1981, murder of Ellen Hansen ("Hansen") and attempted murder of Steven Haertle ("Haertle") in the Santa Cruz Mountains.[6] Haertle survived the attack and was able to identify Petitioner as the shooter, while other eyewitnesses in the area identified Petitioner as being present at the time of the crimes. The prosecution linked the Marin County and Santa Cruz County murders by presenting, *inter alia*, ballistics evidence showing that a single firearm, a .38-caliber Rossi revolver, was used in each of the shootings. Mollie Purnell, who was a friend of Petitioner's, testified she purchased the gun at Petitioner's request and gave it to him. Shane and Karen Williams, who were married bank robbers, testified Petitioner gave them the gun on May 13, 1981. Shane Williams later hid the gun in a vacant lot in San Francisco and subsequently informed law enforcement of the gun's location, allowing it to be recovered by the task force investigating the rash of trailside killings in Marin and Santa Cruz Counties. The prosecution presented several other witnesses who described seeing Petitioner with a gun similar in appearance to the .38-caliber Rossi revolver, as well as evidence that a .38-caliber bullet was found in one of Petitioner's cars. In essence, the ballistics evidence linking all the Marin County and Santa Cruz murders to the same firearm, and the testimonial evidence linking Petitioner to that firearm, comprised the prosecution's evidence linking petitioner to the murders of Moreland, Stowers, Alderson, O'Connell, and May. *Id.* ("The prosecution linked defendant to the crimes of this case primarily by showing that defendant shot Hansen and Haertle, and that the same person committed both the Santa Cruz and Marin County crimes.").[7]

---

[6] These crimes were the subject of Petitioner's 1984 trial in Los Angeles County.

[7] As noted by the California Supreme Court, the identity evidence linking Petitioner to the Haertle and Hansen shootings consisted of, *inter alia*, Haertle's identification of Petitioner at a physical lineup and at trial, in-court identifications of Petitioner by witnesses present in the area at the time

4

Although, during his trial for those crimes, Petitioner did not contest his identity as the gunman in the Santa Cruz killing, he did so in his trial on the Marin County charges. In particular, he challenged the State's shoeprint evidence from the Santa Cruz case and presented eyewitness testimony suggesting someone other than himself may have committed the Santa Cruz crimes. *Id.* at 1031. In addition, as to the Marin County crimes, Petitioner presented alibi testimony from his former employer concerning the day of the Alderson murder, and he testified on his own behalf in an effort to establish an alibi for the days of the Moreland/Stowers and O'Connell/May murders. *Id.* at 1031-32. Following the defense case and rebuttal by the prosecution, Petitioner was found guilty of the following: (1) first degree murder in the deaths of Moreland, Stowers, Alderson, O'Connell, and May; (2) rape as to Alderson and May; and (3) attempted rape as to O'Connell. *Id.* at 1029. In addition, the "jury found true special circumstance allegations of multiple murder and, as to Alderson, May, and O'Connell, rape-murder[;] it also found that [Petitioner] personally used a firearm as to each crime." *Id.*

## II.    Penalty Phase

During the penalty phase, the prosecution presented evidence of Petitioner's numerous additional crimes over several years, including the following: a violent assault on one of his former coworkers, during which Petitioner drove his coworker to a wooded area, threatened her with a knife, hit her on the head with a hammer, and then attacked a law enforcement officer who came to her aid; the attempted rape and stabbing of a woman in another wooded area near Santa Cruz; the kidnapping, forcible rape, and robbery of another woman in the Santa Cruz Mountains; two separate robberies, in Daly City and Calaveras County, respectively, in which women were tied up with rope; the kidnapping and rape of another woman in Calaveras County; Petitioner's escape from custody

---

of the Santa Cruz crimes, testimony connecting Petitioner to a vehicle present at the scene of the Santa Cruz crimes, testimony connecting Petitioner to a unique jacket observed by witnesses, evidence linking Petitioner to the purchase of a pair of shoes, shortly before the crimes, that were consistent with prints left by the gunman, and the recovery of a bag of unexpended .38 caliber ammunition found in one of Petitioner's vehicles after his arrest. *See Carpenter*, 21 Cal.4th at 1030-31. The prosecution presented much of this same evidence at Petitioner's trial for the Marin County murders. *Id.* at 1031.

after the Calaveras County rape; and an incident in which Petitioner brandished a firearm and threatened to kill another individual. *See Carpenter*, 21 Cal.4th at 1033 (citing *Carpenter*, 15 Cal.4th 349-50). The prosecution also presented evidence of the rape and murder of Heather Scaggs ("Scaggs"), another of the Santa Cruz murders that were the subject of Petitioner's 1984 Los Angeles trial. Scaggs was last seen alive on May 2, 1981, on the morning she was scheduled to meet Petitioner to drive to Santa Cruz. Hikers found Scaggs's body, with a fatal gunshot wound to the head, on May 24, 1981. "Physical evidence indicated Scaggs had sexual intercourse near the time of death." *Id.* The .38-caliber Rossi revolver was used to kill Scaggs.

The defense presented considerable mitigating evidence showing Petitioner's unhappy and abusive childhood, and that he had a stutter. *Id.* at 1033. A neuropsychologist testified Petitioner had a "mixed personality disorder" with narcissistic and antisocial features. *Id.* Another psychologist testified Petitioner's experiences in juvenile facilities exacerbated his preexisting psychological problems. *Id.* Petitioner also presented evidence that he was a good employee, well-behaved in prison, and that he was a loving father to his children. *Id.*

In rebuttal, the prosecution presented testimony from Petitioner's first wife, as well as testimony from a parole officer, a state rehabilitation counselor, and two experts who disagreed with the defense experts' opinions. *Id.* at 1034.

The jury returned a verdict of death and the Superior Court imposed judgment in accordance therewith.

## LEGAL STANDARD

Under the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). The first prong applies both to questions of law and to mixed questions of law and fact, *see Williams v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations, *see Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Review under § 2254 is limited to the record that was before the state court that adjudicated the claim on the merits. *See Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011); *see also* § 2254(d)(2).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have separate and distinct meanings. *See Williams*, 529 U.S. at 404. A state court decision is "contrary to" Supreme Court authority and thus falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *See id.* at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *See id.* at 413. While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court law, only the Supreme Court's holdings are binding on the state courts and only those holdings need be reasonably applied. *See Clark v. Murphy*, 331 F.3d 1062, 1070 (9th Cir. 2003), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

On habeas review, a district court may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *See Williams*, 529 U.S. at 411. Rather, to support granting the writ, the application must be "objectively unreasonable." *See id.* at 409; *see also Harrington v. Richter*, 562 U.S. 86, 101 (2011) ("'an *unreasonable* application of federal law is different from an *incorrect* application of federal law'") (emphasis in original). Accordingly, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as

7

'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 653, 664 (2004)). "While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a great[] degree of deference to the state courts." *Clark*, 331 F.3d at 1068.

Similarly, a state court's factual determinations are, on habeas review, accorded deference. *See Pinholster*, 563 U.S. at 180-81. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340 (citing § 2254(d)(2) & (e)(1)).

Under AEDPA, a federal court applying § 2254(d) reviews the "'last reasoned decision' from the state court, which means that when the final state court decision contains no reasoning, [the court] may look to the last decision from the state court that provides a reasoned explanation on the issue." *Murray v. Schriro*, 882 F.3d 778, 801 (9th Cir. 2018) (citation omitted). Where there is no reasoned state court decision providing a rationale for the state court's conclusions, the "habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief[.]" *Harrington*, 562 U.S. at 98. The habeas petitioner meets this burden only by showing that fairminded jurists could not agree with any arguments or theories that may have supported the state court's decision. *Murray*, 882 F.3d at 801-802 (citing *Harrington*, 562 U.S. at 101-102). In conducting this review, the federal court independently reviews the state court record to determine whether the state court's decision is objectively unreasonable. *Id.* at 802 (citing *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013)).

Lastly, even if a petitioner meets the requirements of § 2254(d), habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993) (internal quotation and citation omitted). Under this standard, petitioners "may obtain plenary review of their

8

constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (citing *United States v. Lane*, 474 U.S. 438, 439 (1986)).

## ANALYSIS

### I.     Petitioner's Challenges to the Application of § 2254(d)

In his brief in support of his Group Four claims, Petitioner incorporates by reference an argument made in *Carpenter I*, in which he contended California's habeas scheme has a deficient fact-finding process and incorporates unconstitutional pleading requirements for habeas petitioners, thus requiring the Court to forego application of § 2254(d).  *See* Dkt. No. 191 at 7 (citing *Carpenter I*, 98-cv-2444-MMC, Dkt. No. 248 at 2-32).  The Court rejected Petitioner's arguments in *Carpenter I* and does so again for the reasons set forth in its April 27, 2018, Order therein.  *See Carpenter I*, Case No. 98-cv-2444-MMC, Dkt. No. 251 at 13-16.  Any additional arguments raised by Petitioner regarding "conclusory" allegations and hearsay arguably not resolved by the Court's prior Order will be addressed in the context of Petitioner's specific claims.  *See* Dkt. No. 191 at 3-4.

### II.    *Brady* Claims (10.C.2; 10.C.4; & 10.C.5)

In Claim 10 of the FAP, Petitioner argues he was prejudiced by the prosecution's multiple violations of its duty to disclose exculpatory evidence, *i.e.*, that his due process rights, as explicated in *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, were violated such that he is entitled to a grant of habeas relief.  As discussed previously, some, but not all, of Petitioner's *Brady* claims have been found procedurally barred.  Petitioner's *Brady* claims properly before the court include the following: (a) his claim that prosecutors withheld exculpatory surveillance photographs taken by law enforcement officers as Petitioner, Shane Williams, and Karen Williams entered and exited the warehouse in which, according to trial testimony, Petitioner retrieved the murder weapon (Claim 10.C.2); (b) his claim that prosecutors failed to disclose information that Karen Williams, while armed, had robbed or attempted to rob banks in San Francisco on March 31 and April 1, 1981 (Claim 10.C.4); and (c) his claim that prosecutors failed to disclose an inducement provided to Shane and

9

Karen Williams in order to secure their testimony against Petitioner, namely, that the Williamses were afforded a "conjugal visit" while Shane Williams was detained at the Santa Cruz County Jail in September 1981 (Claim 10.C.5). Petitioner alleges that, in failing to provide him with the above items and information, prosecutors deprived him of essential evidence that would have been material in his effort to impeach or otherwise challenge the Williamses' testimony as well as that of certain law enforcement officers. Following a brief review of the relevant legal principles and a more detailed summary of the testimony given by Shane and Karen Williams, the Court will address each such claim in turn.

### A. *Brady* Principles

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. This duty to disclose applies even in the absence of a request. *United States v. Bagley*, 473 U.S. 667, 683 (1985). Evidence is deemed favorable to the accused if it has either "exculpatory" or "impeachment" value. *Id.* at 676. For a *Brady* claim to succeed, a petitioner must show: (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or impeaching; (2) that it was suppressed by the prosecution, either willfully or inadvertently; and (3) that it was material, i.e., that prejudice ensued. *Banks v. Dretke*, 540 U.S. 668, 691 (2004); *see also Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). [8]

Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cone v. Bell*, 556 U.S. 449, 469-70 (2009). "A reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence,' only that the likelihood of a different result is great enough to 'undermine confidence in the outcome of the trial.'" *Smith v.*

---

[8] For purposes of review under *Brady*, "'material' and 'prejudicial' have the same meaning." *United States v. Kohring*, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

*Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)); *see, e.g., Wearry v. Cain*, 136 S. Ct. 1002, 1006-1007 (2016) (reversing death penalty conviction based on *Brady* violation where impeachment evidence as to key prosecution witnesses suppressed; holding "[e]ven if the jury—armed with all of this new evidence—*could* have voted to convict [defendant], we have no confidence that it *would* have done so") (emphasis in original) (internal quotation and citation omitted). A reasonable probability of a total acquittal is not required to establish materiality; suppressed evidence is material if, had it been disclosed, there is a reasonable probability the defendant would have been convicted of a "different offense or a different degree of the crime." *Shelton v. Marshall*, 796 F.3d 1075, 1085 (9th Cir. 2015), *amended on reh'g*, 806 F.3d 1011 (9th Cir. 2015). "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Smith*, 565 U.S. at 75 (finding impeachment evidence of prosecution's sole witness material).

Moreover, the "mere possibility" that undisclosed information "might have helped the defense or might have affected the outcome of the trial" does not establish materiality under *Brady*. *See United States v. Olsen*, 704 F.3d 1172, 1184 (9th Cir. 2013) (internal quotations and citations omitted).

Importantly, "[m]ateriality is considered 'collectively, not item by item.'" *Reis-Campos v. Biter*, 832 F.3d 968, 975 (9th Cir. 2016) (quoting *Kyles*, 514 U.S. at 436). Accordingly, "[w]hen there are multiple *Brady* claims," a reviewing court "must imagine that every piece of suppressed evidence had been disclosed, and then ask whether, assuming those disclosures, there is a reasonable probability that the jury would have reached a different result." *Browning v. Baker*, 875 F.3d 444, 464 (9th Cir. 2017).

### B. Trial Testimony of Shane and Karen Williams

In the Spring of 1981, Shane and Karen Williams were somewhat akin to a punk rock Bonnie and Clyde, albeit less inclined to violence. Karen was introduced to Shane when she was seventeen, after she responded to a personal ad he had placed in "Trouser Press," a new-age music magazine.

(RT 11930).  Shane, who was incarcerated at Lompoc Penitentiary on a bank robbery conviction at the time he placed the ad, described himself as a "rock and roll bank robber" seeking to meet a "super fine punkette." (RT 11930, 12067-69).  Shortly after Shane was released on parole in 1980, Karen, who at the time was attending school in Arizona, drove to Los Angeles to meet him.  (RT 11932, 12069-70).  After another trip to Los Angeles around Valentine's Day 1981, during which she discovered Shane was using heroin, Karen invited Shane back to Arizona to stay with her.  (RT 11933).  Shane returned with her to Arizona, despite such travel being a violation of his parole.  (RT 12070).

In Arizona, the couple's robbery spree began.  Using her own car, Karen first drove Shane to and from a bank robbery in Phoenix.  (RT 11934).  According to Karen, Shane carried a small "kid's rifle" as a prop during the Phoenix robbery.  (RT 11935 & 11985-86).  They abandoned the gun and the getaway vehicle following the robbery.  (RT 11935).  Thereafter, Shane and Karen fled Arizona for Los Angeles, where Shane committed a bank robbery in Studio City (RT 11939, 11991, 12134).  Then, using a Trailways bus pass, they fled to Las Vegas, where they were married, before making their way to the Bay Area in the early Spring of 1981.  (RT 11939).  There, between visits to local punk rock clubs and hanging out with Shane's acquaintances from his time in prison, they would go on to commit additional bank robberies, in Berkeley (RT 11940), San Francisco (RT 11945), and again in Berkeley (RT 11972), before eventually returning to Los Angeles and committing yet another robbery (RT 11975-76).[9]  In pertinent part, Karen testified that her primary role in these later robberies was to wait for Shane to exit the bank, help him dispose of his disguise, and then help him blend into the crowd afterward (RT 11986-87); she also provided Shane with her bank card, identification card, and another card to hold while he waited for a teller, in order to help him blend in during the second Berkeley robbery (RT 12035).  Both Shane and Karen testified that the Phoenix robbery and second Berkeley robbery were the only times Shane used a gun during the

_____

[9]  Shane aptly summarized his and Karen's activities during this period as "staying in motels, going out to see concerts, and, when [they ran] out of money[,]" robbing banks to fund their lifestyle.  (RT 12102.)

string of robberies. (RT 12071).

Shane met Petitioner when they were inmates at Lompoc in 1978. (RT 12071). Karen met Petitioner sometime in April 1981, when she and Shane had dinner with him at a pizza parlor in San Francisco. (RT 11941). That night, Petitioner offered Karen a piece of paper with his name and phone number on it and told her that he "kn[e]w Shane and . . . Shane will get in trouble, so when he does, you can call me and I'll help you out." (RT 11942). Some weeks later, Shane committed the above-referenced San Francisco bank robbery (RT 11945), at the conclusion of which a bank teller chased Shane onto a bus as he tried to escape (RT 11945-46). Karen, who was waiting to help Shane hide his disguise at a laundromat down the street, began yelling to create a distraction. (RT 11995.) When those efforts failed to stop the teller from chasing Shane, Karen jumped on the teller and hit him with a bag of clothes, allowing Shane to get away. (RT 11995). After a brief scuffle with the teller, Karen fled into a nearby business and was eventually arrested. She gave officers a false name. (RT 11946-47).

After being in custody for several days, Karen told police she attacked the bank teller because she had been attacked earlier that day and, when she saw the teller running toward her, she thought he was trying to attack her. (RT 11996). She denied knowing anything about the bank robbery. (RT 11947). Karen eventually called Petitioner, who visited her at the jail, gave her $20, and agreed to take her home upon her release. (RT 11949). That evening, the charges against her were dropped and she was released. Petitioner paid for a taxi cab to bring her to his home, then drove her to her apartment and gave her $100 after letting her know Shane had already spent the proceeds of the last bank robbery. (RT 11950-52).

A few days later, Petitioner went over to the Williamses' apartment for dinner. (RT 11953). While Karen cooked and cleaned up after dinner, Petitioner and Shane talked about Shane's desire to obtain a gun to aid in future bank robberies. (RT 11953, 12086-87). Eventually, Petitioner drove the trio to a San Francisco warehouse, later identified as the Gems of the Golden West warehouse. (RT 11959 & 12008). Petitioner led Shane and Karen through the warehouse to a filing cabinet,

where he retrieved a bag containing a .38-caliber gun and a box of bullets. (RT 11961-62 & 11965).[10] Petitioner gave it to Karen, who carried it from the warehouse to Petitioner's car and from the car into the Williamses' apartment. (RT 11962). In the apartment, Petitioner showed Shane and Karen how to clean the gun, telling them the gun had been fired the week before. (RT 11964).[11] He also showed them how to stand when firing the gun and instructed them on how to safely use the gun despite its lack of a safety lock. (RT 11965, 12092-93). After Petitioner left, Shane and Karen placed the gun inside an orange bag and hid it under their dresser. (RT 11969-70, 12097).

Unbeknownst to Shane and Karen, law enforcement officers working the Trailside Killer task force had been surveilling Petitioner during his visits to their apartment and during the trip to the warehouse. After Petitioner was arrested on suspicion of being the Trailside Killer, task force officers went to the Williamses' apartment the following morning to serve a search warrant related to the case. (RT 12095-96). The officers did a cursory search of the apartment but did not find the gun. They also questioned Shane and Karen about Petitioner, but the Williamses denied any knowledge of his crimes or of the Trailside Killer. (RT 12095-96). Instead, they told the officers Petitioner had answered their ad in a swingers' magazine and had paid them $40 for sex. (RT 11971, 12001, 12096).

Shane used the gun in the second Berkeley robbery a few days later. (RT 11972, 12097-98). Shortly thereafter, however, the press began printing photos of Shane and Karen in articles about the Trailside Killer and suggesting they were connected to the case. (RT 12047-49). Based on some of these articles, Shane suspected the gun Petitioner gave him was the murder weapon used in the

---

[10] Karen described the bag as a "crumpled brown paper bag." (RT 11961). Shane described it as an "orange plastic bag" which, he later learned, contained a "sandwich-sized brown paper sack, within which was a box of bullets" and, separately, a "pistol wrapped in some yellow cloth[.]" (RT 12089, 12090-91).

[11] Petitioner provided the gun to the Williamses on May 13, 1981. *Carpenter*, 21 Cal.4th at 1030. Heather Scaggs was shot with the same gun. She was last seen on May 2, 1981. *Carpenter*, 15 Cal.4th at 346. Petitioner was questioned by police about Scaggs's disappearance on May 8, 1981. *Id.* at 347.

Trailside killings. (RT 12099-100). A few days later, Shane hid the gun in a vacant lot in San Francisco (RT 11974, 12099-12101); he wrapped the gun in paper found in a nearby phone booth and hid it under some asphalt, or demolition debris (RT 11975 & 12043, 12101).[12] The pair fled San Francisco for Los Angeles and, after committing another robbery there, were arrested by police. (RT 11975-76, 12101-02).

Although, shortly after her arrest, Karen was released without charge on the second Los Angeles bank robbery, she was charged for her role in the Phoenix bank robbery, after which she was released on an appearance bond into the custody of her father. (RT 11978.) An attorney hired by her father negotiated a non-prosecution agreement, by which, in exchange for Karen's information and testimony about the bank robberies and her connection to Petitioner's case, the charge against her from the Phoenix robbery would be dropped and she would not be prosecuted for her role in the other bank robberies or for anything having to do with Petitioner's case. (RT 12051-52). After her release, Karen maintained regular contact with Shane, who was detained in Los Angeles on the many bank robbery charges stemming from the couple's spree. Eventually, she contacted Lieutenant Besse of the Marin County Sheriff's Department to set up a meeting with Shane, with the hope he could get a reduced sentence for the bank robberies. (RT 11981). In exchange for his testimony related to Petitioner's case, Shane was promised the prosecutors would advise his federal sentencing judge of his cooperation, for consideration at his sentencing on the bank robbery charges, and that he would not be prosecuted in Marin County for anything having to do with Petitioner's case, including his possession and disposal of the murder weapon. (RT 12112-13, 11678-79). Shane stated, however, he never received for his tesimony in Petitioner's case any reduction in his sentence or other tangible benefit in his federal case. (RT 12113).

## C. Claim 10.C.2: FBI Surveillance Photographs

In Claim 10.C.2, Petitioner argues that the prosecution violated *Brady* when it failed to

---

[12] Karen testified the gun was wrapped in yellow pages from the phone book (RT 11975), while Shane testified he wrapped it in newspaper he found in the phone booth (RT 12101).

disclose multiple surveillance photos of Petitioner and the Williamses supposedly taken during their trip to the Gems of the Golden West warehouse in San Francisco on May 13, 1981. FAP at ¶¶ 1071-1073. He asserts the photographs "would have provided compelling evidence that Shane and Karen Williams were lying when they claimed that [he] gave them the gun," and that they also would have demonstrated that an FBI agent surveilling Petitioner and the Williamses that night was lying when she testified she did not see them carrying anything out of the warehouse but that her view of them was partially obstructed. FAP at ¶ 1073.[13] The California Supreme Court denied this claim in a summary opinion. Respondent argues reasonable grounds exist to support the state court's decision. *See* Dkt. No. 188 at 4-6. In particular, Respondent asserts, the state court could have reasonably concluded Petitioner's claim is unduly speculative because Petitioner did not present any facts to the state court showing any surveillance photographs described in the FAP actually exist, and because Petitioner's claim that the photographs, assuming they exist, are material for *Brady* purposes relies on his own speculation that the photographs "'could have been helpful to the defense[.]'" *Id.* at 10-11 (quoting First State Pet., App. 28 at 5).

Petitioner has failed to show there was no reasonable basis for the state court's summary decision denying this claim. Respondent's first point, that Petitioner failed to present any evidence beyond his own speculation as to the existence of the *Brady* material, is well taken. In the state court, and again in his briefing in this court, the only evidence Petitioner mustered regarding the existence of any withheld surveillance photographs is a one-page excerpt from a "true crime" book,

---

[13] The FBI agent whom Petitioner accuses of perjury at his trial is Kathleen Puckett. FAP at ¶ 1073. In relevant part, Agent Puckett testified she surveilled Petitioner when he arrived at the Williamses' apartment building and when he left the apartment with the Williamses, whom she did not know or recognize, in his vehicle. She further testified that she followed them to the warehouse district, and that, from a diagonally intersecting street about fifty to seventy-five yards away, she observed them park and enter the warehouse in "a fairly dark area." (RT 11415.) She also testified that, when they left the warehouse a few minutes later, her view of the three individuals, specifically, the lower portions of their bodies, was obscured by Petitioner's car. (RT 11417, 11450.) She did not recall seeing anyone's hands. (RT 11420.) Due to the darkness, she essentially saw "silhouettes of figures" as they entered and exited the warehouse. (RT 11453-54.) She did not see anyone carrying a bag. (RT 11454.) She believed that, given the poor lighting, she would not have seen anything in anyone's hands unless it was large. (RT 11455.)

*The Sleeping Lady*, in which the author, Robert Graysmith, states "nine surveillance photos were silently taken by the police" as Petitioner and the Williamses exited his vehicle and entered the warehouse. *See* Dkt. No. 191 at 8 (citing App. 118). The book apparently makes no mention of surveillance photographs being taken as the party exited the warehouse. Nevertheless, Petitioner infers that, if law enforcement officers surveilling him photographed the party while entering the warehouse, then they surely did so when he exited the warehouse. *Id.* at 10. He maintains such exit photographs should have been disclosed by prosecutors pursuant to *Brady,* due to their potential value in his efforts to impeach trial witnesses, and contends the inference he draws as to their existence is not "speculation," as argued by Respondent, but, rather, is merely the product of "[c]ommon sense." *Id.*

As Respondent points out, Petitioner's claim is unduly burdened with his own speculation. First, the provenance of Petitioner's claim, namely, an unsourced sentence in a "true crime" book, from which Petitioner infers the existence of undisclosed *Brady* material not referenced in the same book, illustrates the speculation inherent in the claim. California state courts have long recognized that, in state habeas corpus proceedings, "[c]onclusory allegations made without any explanation for the basis for the allegations do not warrant relief." *People v. Karis*, 46 Cal.3d 612, 656 (1988). No particular reason or evidentiary proof was offered by Petitioner in the state court or in this court to credit *The Sleeping Lady*'s account of surveillance photographs having been taken of Petitioner and the Williamses as they entered the warehouse, much less as they left, and the author's source for this information is, as noted, not explained.[14] Second, contrary to Petitioner's unsupported

---

[14] Notably, the one-page book excerpt provided by Petitioner appears to contain a description of the night's events that is plainly at odds with the evidence presented at trial. In the excerpt, Graysmith recounts that, as Shane Williams and Petitioner discussed Shane's need for a gun, Karen left the apartment, apparently alone, to place a call to a friend back home in Ohio, because she feared her apartment's phone might be tapped. App. 118. Graysmith then states that, after making the call, Karen returned and then she, Shane, and Petitioner left the apartment and "drove aimlessly" before visiting the warehouse. *Id.* Karen, however, testified she made her phone call after they visited the warehouse; specifically, she testified they stopped on the way back to the apartment to allow her to phone her friend in Ohio. `(RT 11959, 11963.) Shane testified that he and Karen asked petitioner to take them to a phone booth, and that Karen's desire to make a phone call was "the original point of the journey." (RT 12087, 12090.) He further testified, consistent with Karen's testimony, that

argument, "common sense" does not "dictate" a conclusion that photographs were taken as Petitioner and the Williamses left the warehouse, even if they were in fact photographed as they entered the warehouse. Such conclusion presumes the agents would have felt a need to take yet more photographs of the same people they had photographed a few minutes earlier, and it further presumes agents were presented with a static environment that equally facilitated the covert capture of useful surveillance photographs at separate points in time.

In any event, even if the state court might have been unreasonable in concluding Petitioner's claim about the existence of the photographs is unduly speculative, it remains that the state court could have reasonably concluded Petitioner's claim that the photographs were material for purposes of *Brady* is wholly speculative. At a minimum, fair-minded jurists could disagree on this point. Petitioner asserts the undisclosed surveillance photographs are material because they would have shown that the Williamses lied when they testified Petitioner provided them with the murder weapon at the warehouse and that Agent Puckett lied when she testified she was unable to see whether anyone was carrying a bag due to her positioning during her surveillance. FAP at ¶ 1073. Beyond his own speculation, however, Petitioner provides no reason to question the testimony he contends was perjured. Petitioner does not allege, for example, Agent Puckett herself was taking surveillance photographs, or that any surveillance photographs were taken from her vantage point,[15] and Petitioner fails to explain how a surveillance photograph taken by some other person could have shown Agent Puckett's testimony about her observations was false. Indeed, Petitioner does not contend any other law enforcement officer, whether or not taking surveillance photographs, had a better, unobstructed view of the three individuals. Further, Petitioner ignores the several instances in Agent Puckett's testimony where she explained that, in addition to the obstruction posed by

they visited the warehouse and retrieved the gun before stopping to allow Karen to place her call to Ohio. (RT 12090.) In short, the trial testimony does not support Graysmith's account that Karen left the apartment and placed a call to Ohio while Shane and Petitioner discussed guns.

[15] Agent Puckett testified there were other agents surveilling in the area, but that she did not know where they were and could not see them from her position. (RT 11421.)

Petitioner's car, the lighting conditions limited the clarity of her view, causing her to see only "silhouettes" in the dark and further leading her to conclude she would not have seen anything being carried by the trio unless it was large and conspicuous.

As to the alleged perjury by the Williamses, Petitioner fails to show how any surveillance photographs that might have shown the trio leaving the warehouse without a visible bag would have been inconsistent with trial testimony that indicated there was a concerted effort to hide the bag when they exited. Although Shane Williams could not remember who carried the bag containing the gun out of the warehouse (RT 12089), his testimony that they intended to conceal it was unequivocal:

> Somebody had the bag with them. I don't believe anybody was carrying it at their side. Somebody had the bag, and must have put it under their coat, or in their waistband, or in their pocket, or in their purse; but nobody was carrying the orange plastic bag out visible, it was somewhat concealed. . . . I knew that someone had made an attempt to conceal it going to the car, going to the room. So I know it wasn't carried in plain sight, but I just don't remember who concealed it and who carried from which place to where.

(RT 12159-60.) Petitioner fails to explain how a photograph depicting their departure from the warehouse without a visible bag could have possibly impeached this testimony.

For her part, Karen Williams testified she carried the bag out of the warehouse in her hand (RT 11962); she did not, however, indicate whether she attempted to conceal the bag while carrying it. In any event, even if a surveillance photograph clearly depicting both of Karen's hands without a bag arguably could have provided Petitioner with some avenue for impeaching this part of Karen's testimony, the state court—given the ballistics evidence linking the gun to the Santa Cruz and Marin murders, eyewitness evidence linking Petitioner to the Santa Cruz crimes, testimonial evidence showing how Petitioner acquired the gun, and the Williamses' role in leading law enforcement to the murder weapon—could have reasonably concluded any such impeachment of Karen's testimony was insufficient to undermine confidence in the outcome of Petitioner's trial. *See Smith*, 565 U.S. at 75. In particular, the evidence presented by the State established, with corroboration beyond the

testimony of the Williamses, how the murder weapon was acquired by Petitioner and passed to the Williamses before it was recovered by law enforcement on information provided by Shane Williams. Under these circumstances, the state court could have reasonably concluded that any minor challenge a surveillance photograph may have provided as to Karen's testimony is not material. *See id.* ("Evidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict.").

Considering all of the above, it is evident that Petitioner's *Brady* claim depends on his own speculation and supposition that undisclosed surveillance photographs exist and, more importantly, that such photographs are material for *Brady* purposes. As this Court has previously observed, Petitioner must provide more than supposition in order to show *Brady* materiality. *See Carpenter II*, Dkt. No. 251 at 38 (quoting *Baker v. Fleming*, 423 F.3d 1085, 1099 (9th Cir. 2005) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.")). Given the deficiencies described above, the California Supreme Court reasonably could have concluded Petitioner failed to show a *Brady* violation. *See Richter*, 562 U.S. at 101.

Accordingly, Claim 10.C.2 will be denied.

### D. Claim 10.C.4: Information as to Karen Williams's Participation in Armed Robberies

In Claim 10.C.4, Petitioner argues the prosecution violated *Brady* when it failed to turn over evidence that Karen Williams participated in two bank robberies in San Francisco, on March 31, 1981, and April 1, 1981, respectively, and that she used a handgun in those robberies. (*See* FAP at ¶¶ 1078-1085). According to Petitioner, evidence, including investigative reports, photographs, surveillance videotapes, and police reports concerning Karen Williams's participation in those robberies was "crucial exculpatory evidence" because it "would have impeached [her] testimony that she did not commit any bank robberies in San Francisco, and would have established the true nature and extent of both Shane and Karen Williams' criminal activity." FAP at ¶ 1084. Petitioner further asserts that any evidence showing Shane and Karen possessed a gun prior to the date on

which they testified they obtained the gun from Petitioner would "impeach [their] credibility and undermine the prosecution's case" against Petitioner. FAP at ¶ 1085. The California Supreme Court denied this claim in a summary opinion. Respondent argues that, given all the evidence before the jury about Karen Williams's activities, the state court could have reasonably concluded that any evidence of her participation in the additional robberies was cumulative impeachment evidence and, hence, was not material for *Brady* purposes. *See* Dkt. No. 188 at 12. For the reasons that follow, the Court agrees.

As discussed above, the jury at Petitioner's trial was presented with ample evidence showing Karen's participation in multiple bank robberies. She admitted she served as a "get away" driver in one armed robbery and that she attacked and scuffled with a bank employee to aid in Shane's escape from another bank robbery. She also testified that, generally, her role was to help Shane hide his bank robber disguises and blend into a crowd after a robbery. The jury also heard testimony that Karen had attempted to escape from custody after she was arrested in Los Angeles. (RT 11976.) In addition to such testimony depicting her acknowledgment of serious criminal behavior, the jury learned about Karen's numerous instances of lying to law enforcement officers, including when she lied about her identity and role in the bank robbery that precipitated her arrest in San Francisco, when she lied to law enforcement officers serving a search warrant at her apartment in connection with the Trailside Killer case, and when she lied to police in Los Angeles after her second arrest (RT 11976-77). The jury also heard testimony that Karen would lie to and manipulate her friends and acquaintances to gain sympathy or favors. (RT 12049-50.) In short, the jury was amply apprised that Karen willingly helped Shane commit multiple bank robberies and that she very often lied to law enforcement and others to benefit herself.

Nevertheless, Petitioner asserts, evidence that Karen actively participated in two additional bank robberies, and that she did so armed, would have allowed him to further impeach Karen's trial testimony such that the failure to provide him with this evidence violates due process. A substantial pillar of Petitioner's argument is his contention that the prosecution falsely depicted Karen as a

young and naïve girl who, smitten with Shane, only "marginally involved" herself in his illegal activities by being in the area of his robberies, but who had since rehabilitated herself and was a trustworthy witness. *See* Dkt. 191 at 11-12; *id.* at 14 ("Once the prosecution presented her in this false light, her unimpeached assertion that Mr. Carpenter provided the gun to them was not only made more believable, but her testimony in effect corroborated Shane's, making his testimony more credible as well."). Petitioner maintains the evidence of Karen's participation in additional San Francisco bank robberies would have conflicted with this narrative of Karen's culpability and would have allowed him to further impeach her credibility at trial because she previously testified at a preliminary hearing that she was not involved in any other robberies in San Francisco. *Id.* at 15.

Petitioner's argument is unpersuasive. First, Petitioner overstates the extent to which the prosecution tried to portray Karen as less than, in Petitioner's words, a "full-fledged repeat bank robber." Dkt. 191 at 15. As discussed above, the prosecution elicited Karen's testimony about her active participation in multiple bank robberies, including driving the "get away" vehicle at one robbery and violently attacking a bank employee to facilitate Shane's escape from another robbery. While Karen also testified that typically her role was to assist Shane with his escape after a robbery, the evidence plainly showed she was willing to do more when necessary. The jury was left with no question that on multiple occasions Karen conspired with Shane to rob banks and actively assisted him with executing their schemes. In addition to evidence showing her actions to facilitate multiple bank robberies, the jury, as noted above, also learned that Karen had attempted to escape from the custody of police officers in Los Angeles after being arrested for yet another robbery, and it heard about Karen's numerous lies, obfuscations, and omissions in speaking with law enforcement and her friends, all in service of her own needs and interests. Considering this evidence, the jury was not led to believe Karen was not a bank robber or that she was less than fully culpable for such conduct.

Petitioner similarly mischaracterizes Karen's testimony, that at the time of Petitioner's trial she was employed as an office manager for an insurance company, as a misleading prosecutorial

effort to portray Karen as someone "reborn as an honest and credible witness." Dkt. No. 191 at 14. Petitioner fails to explain how such testimony concerning Karen's employment was not credible, and he does not explain how evidence of Karen's participation in two additional armed robberies on top of the ones described to the jury would have substantially impeached any reasonable inference that Karen had, at least to some degree, become rehabilitated by the time of trial several years later. In sum, the state court could have reasonably concluded the evidence of Karen's participation in two additional armed robberies was largely cumulative of other evidence presented at trial showing Karen's participation in various bank robberies, and that the limited impeachment value such evidence might have provided is insufficient to render it material for *Brady* purposes. *See, e.g., Barker*, 423 F.3d at 1096 (finding evidence of undisclosed convictions of trial witness not material for *Brady* purposes where there were "duplicate grounds for impeaching [the witness] that were actually presented to the jury").

Petitioner's other theory as to the materiality of the two additional robberies fares no better. Petitioner argues the prosecution's failure to provide him with evidence that Shane and Karen committed robberies on March 31 and April 1, 1981, "prevented the defense from showing that in fact just days before meeting with [Petitioner] allegedly to obtain a gun—which they claim they did not have and needed to rob banks—they had used a gun in San Francisco bank robberies." Dkt. No. 191 at 15. Karen testified that she and Shane first visited the Bay Area because Shane believed he might be able to obtain a gun from an old acquaintance, not Petitioner, in the area (RT 11940, 11992), an effort that was unsuccessful (RT 11940, 11991-92). She further testified that their first encounter with Petitioner was "probably mid-April" (RT 11943), but that, at that time, they did not tell Petitioner about their criminal activities. (RT 11941-43). Karen testified Petitioner first broached the topic of Shane and Karen's need for a gun when he drove her back home after her release from custody a few days after she was arrested for the May 8, 1981, robbery in San Francisco. (RT 11951). She further testified that Shane and Petitioner talked seriously about a gun a couple of days later, on May 13, 1981, the night of their trip to the Gems Warehouse. (RT 11953).

Shane likewise testified he did not discuss his criminal activities or his desire to obtain a gun with Petitioner until after the May 8, 1981, robbery. (RT 12077.)

In short, without more, any evidence to the effect that Shane and/or Karen may have used a gun in robberies committed on March 31 and April 1, 1981, does not necessarily conflict with Shane and Karen's testimony that Shane wanted Petitioner's assistance in obtaining a gun over a month later when they first started discussing a gun with Petitioner. Further, the evidence showed that each time Shane committed an armed robbery, he abandoned the gun, namely, the rifle in Phoenix and the Rossi .38 in Berkeley, after using it only that one time. Moreover, Shane's account of the May 8, 1981, robbery in San Francisco, which robbery predated any discussion with Petitioner about obtaining a gun, evinces a bank robber lacking a gun. Shane testified that, during the robbery, the bank teller he approached, who was larger than Shane and happened to be the assistant manager, refused to give him money because Shane could not produce a weapon, which caused Shane to desperately wave his finger around like it was a gun while insisting he was robbing the bank. (RT 12077-78). When this ploy, not surprisingly, did not work, Shane grabbed money from another teller and fled the bank with the assistant manager in pursuit. (RT 12078.) It was during this pursuit that Karen attacked the assistant manager so that Shane could escape. (RT 11995.) It is reasonable to infer Shane would have brandished a gun, rather than a finger, if he had a gun and that the assistant manager would not have chased and attempted to capture Shane had he brandished a gun.

Accordingly, while evidence that Shane and Karen actually possessed a gun on April 1, 1981, might have impeached some of the more tangential aspects of their testimony, such as their reason for coming to the Bay Area or their inability to obtain a gun from Shane's other contact, it would have had little relevance to the crucial point of their testimony: Petitioner's provision of the murder weapon to them. Petitioner points to no evidence that Shane and Karen possessed a gun when they first met with him in mid-April, much less during the May 8, 1981, robbery, or when they visited the warehouse together on May 13, 1981. Consequently, the allegedly withheld evidence of the two robberies would have been of little use in showing Shane and Karen did not

need a gun at the time they discussed obtaining a gun from Petitioner in May 1981, and the state court thus could have reasonably concluded such evidence was not material for purposes of *Brady*.

For all the foregoing reasons, the California Supreme Court reasonably could have concluded Petitioner failed to show a reasonable probability existed that, had the cited evidence been turned over, the result of the proceeding would have been different. *See Smith*, 565 U.S. at 75.

Accordingly, Claim 10.C.4 will be denied.

### E.  Claim 10.C.5: Conjugal Visits

In claim 10.C.5, Petitioner alleges the prosecution failed to disclose an inducement it provided to Shane and Karen Williams in exchange for Shane's testimony about how he received the .38-caliber Rossi revolver from Petitioner.  Specifically, Petitioner alleges Shane and Karen Williams were allowed "one or more conjugal visits" during Shane's detention at the Santa Cruz County Jail in September 1981.  *See* FAP at ¶¶ 1086-87.  He further alleges these visits must have been provided as an inducement because the Santa Cruz County Jail did not allow such visits in 1981.  *Id.* at ¶ 1088.  Thus, Petitioner concludes, because his counsel had no knowledge of this alleged inducement prior to trial and could have used such evidence to "impeach the Williams[es]' testimony and credibility," his due process rights pursuant to *Brady* were violated.  *Id.* at ¶ 1089. Petitioner first presented this claim in his second state habeas corpus petition.  The California Supreme Court denied the claim in a summary opinion.  Respondent asserts the allegedly withheld information was not material because the jury was aware of the numerous benefits given to Shane and Karen for their testimony and because ample other evidence corroborated Shane and Karen's testimony linking the gun to Petitioner.  *See* Dkt. No. 188 at 8-10.

In support of his contention that a conjugal visit was arranged by the prosecution, Petitioner proffered the following in the state court: an excerpt from a Santa Cruz County Jail visitation policy, dated July 4, 1994, and revised July 26, 1996, which contains no mention of conjugal visits (*see* Santa Cruz County Jail Visitation Policy, State Pet. App. 130); a declaration from defense investigator Margaret Erickson stating she was familiar with the policies of the Santa Cruz jail in

the early 1980s and that conjugal visits between inmates and non-inmates were not allowed at that time (*see* Margaret Erickson Declaration, State Pet. App. 102); an unsworn letter from Karen stating she became pregnant in September 1981 "during a family visit in Santa Cruz County Jail" (*see* Letter of Karen Williams to Fed. Ct., App. 119), where Shane was being held awaiting his testimony at Petitioner's preliminary hearing; and the birth certificate of Dalek Williams, the Williamses' son, recording his date of birth as June 1982 (*see* Birth Certificate of Dalek Williams, App. 120). *See* Dkt. 191 at 20.

Even assuming a conjugal visit occurred between the Williamses in September 1981, and even further assuming the Santa Cruz County Jail did not ordinarily permit such visits, reasonable grounds exist to support the state court's denial of this claim because Petitioner has failed to establish materiality within the meaning of *Brady*. Citing *Banks v. United States*, 920 F. Supp. 688 (E.D. Va. 1996), Petitioner argues evidence of conjugal visits provided as an inducement was material because it would have adversely affected the Williamses' credibility. (*See* Dkt. No. 191 at 21.) In *Banks*, the prosecution failed to disclose conjugal visits that had been arranged for an informant in exchange for his cooperation, which evidence the district court found both impeaching and material. Petitioner's reliance on *Banks* is, however, misplaced. In *Banks*, in contrast to the instant case, the informant was "vital to the prosecution's case as there was almost no other evidence available." *See* 920 F. Supp. at 693. Here, as set forth above, there was ample other evidence tying Petitioner to the charged crimes, including other witnesses who linked Petitioner with the murder weapon, eyewitnesses who identified Petitioner at the Hansen and Haertle scene, and ballistics evidence connecting all the murders to the same gun.

Moreover, as to the Williamses, the record already contained a considerable amount of impeachment evidence. In particular, both Shane and Karen Williams testified at trial about their criminal activities, various lies and omissions to law enforcement and others, and the favors they received from the prosecution in exchange for their testimony, including avoiding charges for any

crimes that could have been based on their possession of the gun[16] and lies to investigators about their connection to Petitioner, "complete immunity" for Karen Williams's involvement in at least one of the bank robberies (RT 12051-52), and a letter to Shane Williams's federal sentencing judge describing Shane's cooperation in Petitioner's case. In general, immunity from prosecution, or a prosecutor's exercise of discretion not to prosecute, is a more significant inducement, and hence is more material in any impeachment effort, than would be a conjugal visit.[17] *See, e.g., Horton v. Mayle*, 408 F.3d 570, 580 (9th Cir. 2005) (finding promises of immunity or leniency are "a wholly different kind of impeachment evidence" because they permit the inference that the witness has "an interest in fabricating his testimony"). Here, given the evidence of the other government favors, the evidence as to conjugal visits would have been, at best, cumulative. *See Turner v. United States*, 137 S.Ct. 1885, 1894 (2017) (holding suppressed evidence not material where evidence was "largely cumulative of impeachment evidence petitioners already had and used at trial"; finding "cumulative effect" of withheld evidence did not undermine confidence in verdict); *see also United States v. Rodriguez*, 766 F.3d 970, 989 (9th Cir. 2014) (finding nondisclosure of impeaching evidence not material where witness's credibility already undermined). Under such circumstances, the California Supreme Court reasonably could have concluded Petitioner failed to show a reasonable probability existed that, had the cited evidence been turned over, the result of the proceeding would have been

[16] It has long been a felony offense in California to possess a firearm with a previous felony conviction. *See* Cal. Penal Code § 29800 (2017); *see also People v. King*, 22 Cal.3d 12, 21 (1978) (discussing legislative and judicial history of statute, then codified at Cal. Penal Code § 12021, criminalizing possession of firearms by convicted felons). In his statement to Lt. Besse, Shane, a previously convicted bank robber, admitted to possessing a firearm, and, presumably, could have been prosecuted for that crime by state authorities.

[17] Petitioner takes issue with this premise, arguing conjugal visits were subjectively very important to Shane as demonstrated by what Petitioner describes as an attempt to "bargain" for such a benefit with the judge presiding over Petitioner's trial on the Santa Cruz crimes in 1984. *See, e.g.*, Dkt. No. 191 at 19, 20. In the transcript portion cited by Petitioner in support of this argument, Shane asks the trial judge to order the press to refrain from printing information about him and his testimony in the case, after which Shane states that, had such request not been denied: "I would have then asked you for some favors in the realm of visitation with my wife in this court building since I am not being allowed—[,]" *Carpenter I*, Civ. No. 98-cv-2444-MMC RT 12490, at which point he was cut off by the judge, thereby leaving his circumstances unexplained.

different. *See Smith*, 565 U.S. at 75.

Accordingly, Claim 10.C.5 will be denied.

## F. Cumulative Materiality Analysis

As explained above, "[w]hen there are multiple *Brady* claims," a reviewing court "must imagine that every piece of suppressed evidence had been disclosed, and then ask whether, assuming those disclosures, there is a reasonable probability that the jury would have reached a different result." *Browning*, 875 F.3d at 464. As discussed in detail in the previous sections, the Court has determined the state court could have reasonably found each item of allegedly withheld evidence was not material within the meaning of *Brady*. The Court further finds the state court, in considering those items not just separately but also cumulatively, could have found there is no reasonable probability the jury would have reached a different result had all such allegedly withheld evidence been disclosed. In particular, for all the reasons given throughout this Order, chiefly, the considerable impeachment evidence already in the record and the substantial evidence of Petitioner's guilt, it is not reasonably probable the disclosure of the purported surveillance photographs, evidence of Karen's purported participation in two additional armed robberies, and evidence of an additional inducement in the form of a conjugal visit would have caused the jury to reach a different result.

Accordingly, Claim 10, to the extent it has not for his testimony in Petitioner's case. been adjudicated procedurally barred, will be denied.

## III.    Claim 11: Failure to Preserve Newspaper

In Claim 11, Petitioner alleges the prosecution deprived him of due process of law and a fair trial because it destroyed and/or failed to collect and preserve "potentially exculpatory" evidence, namely, the newspaper Shane Williams testified he used to wrap the gun before hiding it in a vacant lot in San Francisco, and in which Lt. Besse testified he found the gun wrapped when he recovered it pursuant to Shane's directions. FAP at ¶¶ 1103-04, 1108. Petitioner asserts the "newspaper in which the handgun was wrapped was critical to the defense theory that Williams did not supply the

handgun to Besse." *Id.* at ¶ 1106. He appears to argue forensic testing on the newspaper or other items of evidence at the scene of its recovery would have provided exculpatory evidence in support of this theory. *Id.* He further asserts the date on the newspaper "was significant because, if that date was after the date that Williams said he put the gun in the vacant lot, it would have impeached his testimony and completely undermined the prosecution case[.]" *Id.*

Petitioner first presented this claim in his state habeas petition filed November 1, 1999. The California Supreme Court held the claim was barred pursuant to *In re Dixon*, 41 Cal. 2d 756, 759 (1953), because Petitioner could have raised the claim on direct appeal but failed to do so. However, the California Supreme Court also denied all claims presented in the petition, including the instant claim, on the merits without further explanation. In this court, Respondent contends the claim is procedurally barred pursuant to the California Supreme Court's *Dixon* ruling, and that, notwithstanding the procedural bar, reasonable arguments exist to support the state court's alternative merits determination. Dkt. No. 188 at 11. The Court will consider Respondent's arguments in turn.

### A. Procedural Bar

In previous court orders, as noted above, several of Petitioner's claims have been found procedurally barred. In particular, in an Order entered May 8, 2015, the Court found Claim 11 procedurally barred based on the California Supreme Court's finding, in state habeas proceedings, the claim was barred pursuant to *In re Dixon*. *See* Dkt. No. 175 at 4-6. Although the Court subsequently vacated the relevant part of its May 8 Order concerning Claim 11, *see* Dkt. No. 184 at 2, the Court, upon reconsideration in light of the United States Supreme Court's decision in *Johnson v. Lee*, 136 S.Ct. 1802 (2016), thereafter reinstated the vacated portion, thereby restoring its finding that Claim 11 is procedurally barred. *See* Dkt. No. 200 at 1-2. In his Group Four brief, Petitioner does not address whether he can establish cause and prejudice for the default of Claim 11. Nevertheless, because the Court finds reasonable grounds exist to support the state court's alternative merits determination, the question of cause and prejudice need not be resolved herein.

*See, e.g., Ayala v. Chappell*, 829 F.3d 1081, 1095-96 (9th Cir. 2016) (foregoing procedural default cause and prejudice analysis; applying AEDPA deference to state court's alternative summary denial of claim on the merits).

### B. Denial Pursuant to § 2254(d)

In addition to finding Claim 11 *Dixon*-barred, the California Supreme Court, as noted, summarily denied Claim 11 on its merits. Following a review of the relevant legal principles underlying Petitioner's claim, the Court will discuss the reasonable basis for the state court's decision.

#### 1. Due Process and Evidence Preservation

In *California v. Trombetta*, 467 U.S. 479, 489 (1984), the Supreme Court held that the government's failure to preserve evidence violates the due process rights of the defendant if the evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and [is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Importantly, however, where the State's failure to "preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," a failure to preserve such "potentially useful evidence " does not constitute a denial of due process "unless a defendant can show bad faith on the part of the police." *Arizona v. Youngblood*, 488 U.S. 51, 57-58 (1988). "The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id.* at 56 n.*.

#### 2. Testimony Regarding Failure to Preserve Newspaper

On June 30, 1981, Lieutenant Besse met with Shane Williams, who was at the time detained on bank robbery charges in Los Angeles. (RT 11675.) Although he could not recall the exact address, Shane described to Lt. Besse, based on nearby landmarks, the vacant lot in San Francisco where he hid the gun. (RT 11680-81.) He advised Lt. Besse that, before hiding the gun under some

broken asphalt in the vacant lot, he had wrapped the gun in newspaper he found in a nearby phone booth. (RT 11681.) After concluding his interview with Shane, Lt. Besse returned to San Francisco and proceeded directly from the airport to the area of the city where Shane said he hid the gun. (RT 11682.) Following Shane's directions, Lt. Besse located the vacant lot and the gun, which was wrapped in newspaper as described by Shane. (RT 11682-83.) Lt. Besse marked the spot where he found the gun, using a can or debris to do so, and placed the gun in his vehicle. (RT 11683.) He later turned the gun over to another employee of the Marin County Sheriff's Department for forensic analysis, but disposed of the newspaper because he did not believe it had evidentiary value. (RT 11685.)[18] He did not notice the date, if any, on the newspaper prior to disposing of it (RT 11686) nor did he summon any law enforcement evidence-gathering team to the vacant lot that evening. Although he had a camera and flash available, he did not take any photographs, as he did not want to use artificial lighting, believing it would attract a crowd in an area of the city he considered unsafe. (RT 11686, 11770-71.) He returned to the lot the following morning to take photographs and compose a diagram of the lot. (RT 11686.)

### 3. Reasonable Basis for State Court's Merits Determination

Respondent argues a reasonable basis exists to support the state court's denial of Claim 11 on the merits. First, Respondent asserts, Petitioner failed to allege in his state court habeas petition anything tending to show the newspaper, or any other surrounding evidence he faults law enforcement officers for failing to retain, had apparent exculpatory value or that he would be unable to obtain comparable evidence by other reasonably available means. Dkt. No. 188 at 15. Second, Respondent argues, because Petitioner's claim is dependent on speculation that fingerprint testing might have yielded exculpatory evidence or that the newspaper might have borne a date

---

[18] In previous testimony given at a preliminary hearing, Lt. Besse testified he believed he had turned over the newspaper, along with the gun, to the Marin County Sheriff's evidence technician so that it could be subjected to forensic analysis. (RT 11766-67.) At trial, he testified that his previous testimony about his possibly turning over the newspaper was erroneous because, after reviewing his documentation, he discovered he had not identified the newspaper with an evidence number, which he would have done as part of the cataloging of evidence at the time it was turned over for testing. (RT 11766-67.)

United States District Court
Northern District of California

incompatible with the timeline in Shane Williams's testimony, such claim fails because Petitioner failed to allege in his state petition anything tending to show bad faith on the part of law enforcement in disposing of such potentially exculpatory evidence. *Id.* Third, Respondent argues that the state court could have reasonably concluded any error in failing to preserve the newspaper or other evidence from the lot was harmless pursuant to *Chapman v. California*, 386 U.S. 18 (1967), given the substantial evidence linking Petitioner with the gun and the gun with the murders, as well as linking Petitioner to the Hansen/Haertle crimes. *Id.* at 15-16. As set forth below, the Court agrees.

Petitioner points to no allegation presented to the state court showing the discarded evidence possessed apparent exculpatory value at the time Lt. Besse destroyed or discarded it. Rather, Petitioner asserts the evidence, if collected, preserved, and, where applicable, subjected to forensic testing, might have provided a further basis upon which to impeach Shane Williams's testimony about how he acquired the gun from Petitioner. *See* Dkt. No. 191 at 28. Consequently, in order to show a due process violation resulting from the failure to preserve such potentially exculpatory evidence, Petitioner is required to plead facts showing bad faith on the part of the police in failing to preserve that evidence. *Youngblood*, 488 U.S. at 57-58. To carry his burden of showing the state court unreasonably denied his claim on the merits, Petitioner appears to argue an inference can be drawn that Lt. Besse acted in bad faith in destroying the newspaper because aspects of his conduct and trial testimony suggest a lack of credibility. Dkt. No. 191 at 28-29. In particular, Petitioner accuses Lt. Besse of having "played fast and loose with the legal system" in an effort to conceal the exculpatory value of the newspaper and solidify the state's case against Petitioner. In support of such assertion, Petitioner cites Lt. Besse's conflicting testimony about whether he provided the newspaper to the evidence technician, as well as his testimony that he knew fingerprint testing could have been performed on the newspaper. *Id.* He also relies on Lt. Besse's failure to call for backup so that he could take photographs on the night he recovered the gun and his purported attempt to mislead a federal sentencing judge by failing to disclose to said judge the fact that Shane Williams used in one of his robberies the gun he acquired from Petitioner. *Id.*

Petitioner's arguments are unavailing, as his allegations in his state habeas petition, and any expansion thereof he applies in his federal court briefing, fall short of establishing any bad faith on the part of Lt. Besse or any other law enforcement officer or entity. A reasonable finding can be made that any inconsistency in Lt. Besse's testimony about whether he turned over the newspaper to the Sheriff Department's evidence technician does not show a scheme to obscure a due process violation. The prior inconsistent testimony highlighted by Petitioner was offered at a preliminary hearing conducted in September 1985, more than four years after Lt. Besse recovered the gun in San Francisco. The state court could have reasonably concluded any error in Lt. Besse's testimony that he "believed" he had turned over the newspaper was attributable to the passage of time between the relevant events and such testimony. Likewise, the state court could have reasonably concluded Lt. Besse's testimony at trial as to his failure to preserve the newspaper and reason for discarding it, specifically, that he did not feel it possessed evidentiary value, was adequately explained by his testimony that, in the interim between the preliminary hearing and the trial, he had reviewed his paperwork and found no indication he had marked the newspaper as evidence at the time he turned over the gun for testing . (RT 11766-67.)

The state court also could have reasonably concluded Lt. Besse's knowledge that the newspaper could have been tested for fingerprints does not show Lt. Besse acted in bad faith, in that he submitted the gun for fingerprint analysis, which he no doubt would have viewed as the more significant piece of evidence to be linked to Petitioner. Furthermore, there were no fingerprints attributable to Shane Williams on the gun, *see* Dkt. No. 191 at 26 n.17, and Petitioner has alleged no facts or offered any explanation for an implicit theory that a newspaper also lacking Shane's fingerprints would have any appreciably enhanced exculpatory or impeachment value. As to Lt. Besse's failure to call backup to the vacant lot, Petitioner has not provided any factual allegations pertaining to the best, or any, law enforcement practices in that regard, nor are there any allegations that the scene had deteriorated or been tampered with by the time Lt. Besse returned a few hours later to take photographs and sketch a diagram. Lastly, the state court could have reasonably

concluded Lt. Besse's failure to disclose, in his letter to Shane Williams's sentencing judge, all the facts surrounding Shane's assistance does not show Lt. Besse acted in bad faith in failing to preserve the newspaper. To the extent any connection between these two disparate events can be divined, Petitioner's argument that Lt. Besse intended to mislead the federal judge is unpersuasive. The purpose of the letter was to describe Shane's assistance to law enforcement in the investigation of an accused serial killer. The extent of Shane's connection to the gun was not germane to that purpose. Moreover, Lt. Besse would have been justified in assuming a judge sentencing Shane for multiple bank robberies would have already acquired all the pertinent information related to those robberies, including whether Shane was armed.

In sum, the state court could have reasonably concluded Petitioner failed to plead sufficient facts to support a finding of bad faith on the part of Lt. Besse.

## C. Harmless Error

Respondent argues, *see* Dkt. No. 188 at 15-16, the state court could also have reasonably concluded that, even if Petitioner were able to establish a due process violation related to the failure to preserve the newspaper, any such error was harmless. Petitioner disagrees, reasoning, "if the newspaper showed an absence of Shane Williams's fingerprints and/or a date which came after Williams was taken into federal custody in Los Angeles, Williams's entire story about the gun would be found by any reasonable juror to be wholly worthy of disbelief." Dkt. No. 191 at 29. Furthermore, Petitioner argues, if Shane's story about the gun is to be disbelieved, and because "other witnesses by whom the prosecution sought to connect [Petitioner] with the murder weapon were likewise not credible, . . . any determination of harmlessness by the California Supreme Court would have been unreasonable." *Id.*

Petitioner's arguments are unavailing. Considering the circumstances surrounding Lt. Besse's recovery of the gun, the only reasonable conclusion to be drawn from the evidence is that Shane Williams provided Lt. Besse with the gun's location. Any implicit contention otherwise by Petitioner would necessarily implicate a fanciful story involving Lt. Besse's prior possession of the

gun or knowledge of its whereabouts, none of which is explained by Petitioner, as well as Lt. Besse's complete fabrication of Shane Williams's story of how he acquired and hid the gun, along with a gratuitous trip to Los Angeles to consummate the whole scheme. There is no evidence in the record before the state court, and no factual allegation in the state petition, or, for that matter, in the federal petition, that could substantiate such a story.

Assuming Shane Williams, contrary to Petitioner's argument, provided Lt. Besse with information about the location of the gun, Petitioner's remaining arguments can be readily addressed and discounted. First, Petitioner fails to explain how an absence of Shane Williams's fingerprints on the newspaper would have been found especially consequential by the jury, given, as he concedes, the absence of Shane's fingerprints on the gun itself. Second, the jury heard from other witnesses who provided evidence linking Petitioner to the gun. Although such evidence, Petitioner asserts, was "not credible,"[19] it apparently was deemed credible by the jury. Under such circumstances, the state court could have reasonably concluded the prosecution's case would not have crumbled for want of a fingerprint on a newspaper. Third, Petitioner's contention about the supposed impact of a hypothetical date on the newspaper is too attenuated to have warranted serious consideration in the state court or in this court. As discussed above, the only reasonable conclusion to be drawn from the evidence at trial is that Lt. Besse learned of the gun's location from Shane Williams. Nothing alleged in the petition credibly casts doubt on that conclusion. Moreover, there is no evidence that Lt. Besse observed a date on the newspaper, or even that the newspaper had a date printed on it, much less that any purported date on the newspaper was after Shane's detention in Los Angeles. One can conjure up myriad hypotheticals that rest on some theory of law enforcement error or oversight, and that cannot be disproven decades later, but Petitioner points to

---

[19] Petitioner's contention that the other witnesses who connected him to the gun were not credible is addressed in his brief in conjunction with his discussion of Claim 10.C.5. *See* Dkt. No. 191 at 29 (referring to earlier discussion in Claim 10.C.5). In that portion of his brief, Petitioner discusses perceived problems with the trial testimony of four witnesses whose testimony established Petitioner's possession of the gun. *Id.* at 22-23. Petitioner cites portions of each witness's trial testimony to support his claim that such witness was not credible. *Id.*

no authority requiring the state court, in the absence of any evidentiary support, to credit them in its harmless error analysis.

Petitioner thus has failed to show the state court could not have reasonably concluded any due process violation related to the failure to preserve the newspaper was harmless.

Accordingly, for all of the foregoing reasons, Claim 11 will be denied.

## CONCLUSION

For the reasons stated, Claims 10.C.2, 10.C.4, 10.C.5, and 11 in Petitioner's First Amended Petition are hereby DENIED. Within 30 days of the date of this Order, the parties shall file a proposed briefing schedule for Petitioner's Group 5 claims.

**IT IS SO ORDERED.**

Dated: September 13, 2019

MAXINE M. CHESNEY
United States District Judge

United States District Court
Northern District of California